567 F.Supp. 1011 (1983)
NATIONAL REPORTING COMPANY, Plaintiff,
v.
ALDERSON REPORTING COMPANY, INC., Defendant.
No. 80-1289C(4).
United States District Court, E.D. Missouri, E.D.
July 1, 1983.
*1012 *1013 Andrew F. Puzder and H. Kent Munson, St. Louis, Mo., for plaintiff.
John Gianoulakis, St. Louis, Mo., for defendant.

MEMORANDUM OPINION
CAHILL, District Judge.

I.

Introduction
National Reporting Company (National) commenced this antitrust action against Alderson Reporting Company, Inc. (Alderson) seeking damages under § 4 of the Clayton Act, 15 U.S.C. § 15, and a permanent injunction under § 16 of the Clayton Act, 15 U.S.C. § 26. The sole basis of National's complaint is that Alderson violated the federal antitrust laws by submitting a bid that was far below Alderson's average variable costs to obtain a one-year court reporting contract with the United States Tax Court. National alleges that Alderson's bid was "predatory" and that by submitting the bid and obtaining the one-year Tax Court contract, Alderson monopolized, attempted to monopolize, and conspired to monopolize in violation of § 2 of the Sherman Antitrust Act, 15 U.S.C. § 2. The complaint seeks a permanent injunction against Alderson and $3,600,000 in damages.
This case was tried to the Court and the parties presented witness testimony and documentary evidence. The parties also presented extensive pretrial and post-trial legal memoranda. Based on the record before the Bench, the evidence adduced at trial, and the legal memoranda filed by both parties in this action, the Court makes the following Findings of Fact and Conclusions of Law.

II.

Findings of Fact
1. National Reporting Company was formed in June, 1972, and is a corporation organized and existing under the laws of Missouri. National was formed to engage in court reporting services, particularly to provide those services exclusively through the use of multi-track tape recording.
2. Alderson Reporting Company is a Delaware corporation with its principal place of business in Washington, D.C., but transacts business within the Eastern District of Missouri. Alderson is also engaged in the court reporting business and has court reporting equipment with multi-track recording capability.
3. The United States Tax Court hears cases in every state of the United States. The court reporters that record the Tax Court sessions travel across state lines, utilize the United States Mail to transmit tapes and typewritten transcripts, and write and receive interstate correspondence, all of which affects interstate commerce.
4. In 1972 National submitted a bid to provide court reporting services for the United States Tax Court. National's bid was lower than the bids of the other court reporting companies in contention. The Tax Court awarded the contract to National for the year 1972. In 1972 all of the bidders except National used conventional methods of court reporting (i.e., stenograph, stenotype, etc.).
*1014 5. The Tax Court follows a policy of allowing contractors who perform satisfactorily to renew their contract with the court at the previous year's price level. If the contractor does not wish to renew the contract at the price of the previous year, the court again puts the contract out for bids.
6. In 1973 National again offered its services to the Tax Court for the price it offered in 1972. The Tax Court renewed the contract with National. But, in 1974 the Tax Court again let the court reporting contract out for bids. Many companies submitted bids for the 1974 contract but the Tax Court judges decided to reject all of the bids in order to change the contract specifications.
7. Prior to 1974 the specifications of the Tax Court's court reporting contracts permitted all methods of court reporting. But in 1974 the Tax Court judges decided that electronic court reporting was preferable. The judges decided that electronic court reporting had produced the finest transcripts the court had experienced. The Tax Court had experienced various court reporting methods including shorthand, stenotype, electronic means, and stenomask. The Tax Court judges determined that electronic reporting had consistently produced the highest quality transcripts, and particularly was more accurate than other means of reporting. The judges also concluded that transcripts furnished by the means of electronic reporting were more timely received as opposed to transcripts prepared by conventional methods of reporting. The judges also stressed the desirability of listening to the recorded voices of the parties which enabled the court to recapture the manner in which the words were spoken. Also as part of the new specifications the judges felt that the court reporting contractor should not subcontract any more than ten percent of the court reporting work. As a result, at least ninety percent of the work would have to be performed by the employees of the primary contractor.
8. To meet all of the demands of the new contract specifications, the court limited the means of recording to four-track electronic recording systems and specifically excluded all types of conventional court reporting methods.
9. After drafting the new specifications, the Tax Court again let the court reporting contract out for bids. Because National was the only company able to meet the new specifications required by the Tax Court, only National sought the 1974 contract. The initial costs and problems of any court reporting company trying to meet the new Tax Court specifications were prohibitive. Court reporting companies seeking the Tax Court contract had to be capable of recording fourteen separate sessions in fourteen different places in the United States at the same time. The company would also have to provide back-up equipment that had the same features as the primary equipment for each Tax Court session. The company would also have to acquire at least seven additional four-track tape recorders to transcribe the tapes previously recorded. As a result, a court reporting company would have to acquire at least 35 four-track recorders at a cost of about $1,300 each. In addition, the company would have to purchase numerous microphones and tapes. The court reporting company would also have to hire and train employees who would have to be willing to travel on short notice for two or three weeks at a time.
10. Again, because National was the only company that submitted a bid for the 1974 contract under the new specifications, the Tax Court awarded it the court reporting contract for that year.
11. In response to the new Tax Court specifications for court reporting contracts, one company, CSA, emerged to contest the new requirements. CSA filed a protest with the office of the Comptroller General of the United States claiming that the new restrictions violated certain federal statutes. CSA argued that federal law limits electronic reporting in the United States District Courts to an augmenting rather than primary role. CSA further offered *1015 that another federal statute provides for court reporting through stenographic means and that both sections apply to the Tax Court. CSA concluded that the requirements of electronic reporting and the limit on subcontracting to ten percent of all recorded sessions were unjustified. The Comptroller General rejected the arguments of CSA and held that the federal provisions cited by CSA do not apply to the United States Tax Court.
12. The court reporting companies that utilized conventional means of reporting were affiliated with the "National Reporting Council, Inc." Alderson was also a member of that organization. There is evidence before the Court that the companies in the National Reporting Council viewed the electronic method of court reporting as a threat to conventional means of reporting. There is also evidence before the Court that members of the National Reporting Council resolved to take some action to compete with the development of electronic methods of court reporting. Hal Alderson, who was once president of Alderson Reporting, wrote a letter dated September 20, 1974, that apprised the members of the National Reporting Council of the legislative activity that was going on in the United States Congress dealing with the court reporting issue. The letter asked the members of the council to write to their respective congressional representatives and to lobby the congressmen for passage of a law which would prohibit the Tax Court from imposing the requirements of electronic recording. Hal Alderson's letter viewed electronic reporting as "not only as a matter of precedent but in actual fact ... the greatest blow the reporting profession has received in the past thirty years."
13. In 1976 Hal Alderson and Ira Sharp, vice president of Alderson Reporting at the relevant times herein, met with officers of National Reporting to discuss the court reporting matter. At that meeting Hal Alderson indicated an interest in working with National in some type of a joint venture, merger, or buyout. The National officers stated that National would be open to discussing any formal proposal that Alderson wished to make, including the terms of a buyout. Hal Alderson indicated that a group of reporting companies were willing to provide the money for a buyout and that he would advise National on such action in a short time. However, the National officers did not discuss any transactions with Hal Alderson after that initial meeting.
14. In 1977 Ira Sharp again contacted National on numerous occasions seeking to further discuss a joint venture or buyout. National's response was again that it would consider any formal proposal submitted by Alderson. But any probability of a business transaction between National and Alderson was clouded by a court proceeding in 1979 where Alderson pleaded guilty in the United States District Court for the District of Columbia to criminal charges of conspiracy to allocate contracts and to fix prices in violation of federal antitrust laws.
15. National renewed its contract with the Tax Court at the 1974 prices continually until 1980. In 1980 National advised the Tax Court that it could no longer profitably renew the contract at 1974 costs. So again the Tax Court let the court reporting contract out for bids.
16. In 1980 only two companies competed for the Tax Court court reporting contract, Alderson and National. Alderson's bid was substantially lower than National's bid. When projecting expenses in preparation for a contract bid, the court reporting companies gauged their expenses on a cost per original page of transcript basis. The projected expenses estimated by the Alderson officers were no less than $1.45 per original page of transcript. There is evidence before the Court that Alderson's actual expenses, direct and indirect, would amount to over $4.00 per page of original transcript.
17. Alderson's bid to the Tax Court would yield about $1.27 per original page of transcript. Hal Alderson, who by that time *1016 was no longer an officer at Alderson but was a consultant, expressed his concern to the then-current officers of Alderson that the bid to the Tax Court was too low.
18. The Tax Court also expressed some concern about the Alderson bid. Shortly after the 1980 contract bids were opened, the Tax Court wanted to insure that Alderson had not made an error in its bid. The Court advised Alderson to check its computations for accuracy. Alderson responded that the Tax Court should proceed with the bid as submitted.
19. After the Tax Court awarded Alderson the 1980 court reporting contract, Alderson had to hire some of National's employees to meet the requirements of the contract.
20. Because there were only two bidders for the Tax Court 1980 contract, National would have been awarded the Tax Court contract had it been the low bidder because of National's satisfactory performance in the previous years.
21. The Tax Court let out bids for the court reporting contract again in 1981. This time Alderson submitted a bid that was about three times higher than its 1980 bid. Alderson was again the lowest bidder and would have been awarded the 1981 contract except that the Tax Court determined that Alderson was an "irresponsible bidder" judging from Alderson's poor performance during the 1980 contract year. The 1981 contract was awarded to Acme Reporting which also was awarded the 1982 contract.
22. The Court finds that the court reporting contract for the United States Tax Court was unique in the federal court system. It was the only contract which required direct electronic recording and specifically prohibited all other types of court reporting. Furthermore, the Tax Court required four-track electronic recorders to allow separation of voices. No other contracts in the federal system had such specifications. The Tax Court contract was also unique because the specifications required that ninety percent of the reporting work be performed by employees of the primary contractor. All of the federal reporting contracts have traditionally allowed subcontracting without limitation.
23. Additionally, the specifications for the 1980 contract required back-up equipment of the same type as the primary four-track recording equipment. No other federal agency or court required such back-up equipment. Also, the Tax Court contract required proofreading of the transcripts against the actual recording, rather than mere proofreading of the transcribed material. Again, no such requirement existed in other federal courts. Finally, the Tax Court contract required a bidder to make a showing of experience in electronic reporting services. This requirement was also unique to the Tax Court.
24. The Court finds that Alderson submitted a predatory, below cost bid for the 1980 Tax Court contract with the major purpose and effect of eliminating National from competition for the Tax Court contract.
25. The Court further finds that Alderson submitted the predatory, below cost bid to obtain the Tax Court reporting contract with the intention of later recouping its losses the following year and reaping supra-normal profits by eliminating National as a competitor in the Tax Court market.
26. Alderson's actions in submitting the predatory, below cost bid directly caused injury to National's business. Inasmuch as National was the only other bidder for the 1980 contract, the Court concludes that Alderson's acts were targeted specifically at National. As the direct and proximate result of Alderson's illegal acts, National was forced out of business and sustained a loss of net profits of approximately $228,917 for the 1980 contract year. However, the Court is not convinced that National would have received the 1981 and 1982 Tax Court contracts. Therefore, damages for lost profits in those years are speculative.

*1017 III.

Conclusions of Law
1. This Court has jurisdiction to entertain this matter and to afford National the relief it requests in the complaint pursuant to 15 U.S.C. §§ 15 and 26. Title 15, § 15 provides:
Suit by Persons Injured  Amount of Recovery: Prejudgment Interest.
(a) Except as provided in subsection (b) of this section, any person who shall be injured in his business or property by reason of anything forbidden in the antitrust laws may sue therefor in any district court of the United States in the district in which the defendant resides or is found or has an agent, without respect to the amount in controversy, and shall recover threefold the damages by him sustained, and the cost of suit, including a reasonable attorney's fee. The Court may award under this section, pursuant to a motion by such person properly made, simple interest on actual damages for the period beginning on the date of service of such person's pleading setting forth a claim under the antitrust laws and ending on the date of judgment, or for any shorter period therein, if the court finds that the award of such interest for such period is just in the circumstances ....
Title 15 U.S.C. § 26 reads:
Injunctive Relief for Private Parties; Exception
Any person, firm, corporation, or association shall be entitled to sue for and have injunctive relief, in any court of the United States having jurisdiction over the parties against threatened loss or damage by a violation of antitrust laws, including sections 13, 14, 18, and 19 of this Title, when and under the same conditions and principles as injunctive relief against threatened conduct that will cause loss or damage is granted by courts of equity, under the rules governing such proceedings, and upon the execution of proper bond against damages for an injunction improvidently granted and a showing that the danger of irreparable loss or damage is immediate, a preliminary injunction may issue: provided, that nothing herein contained shall be construed to entitle any person, firm, corporation, or association, except the United States, to bring suit in equity for injunctive relief against any common carrier subject to the provisions of subtitle IV of Title 49, in respect of any matter subject to the regulation, supervision, or other jurisdiction of the Interstate Commerce Commission. In any action under this section in which the plaintiff substantially prevails the Court shall award the cost of suit, including a reasonable attorney's fee to such plaintiff.
2. National brought this suit under 15 U.S.C. § 2 claiming a federal antitrust violation. Title 15 U.S.C. § 2 reads as follows:
Monopolizing Trade a Felony; Penalty
Every person who shall monopolize, or attempt to monopolize, or combine to conspire with any other person or persons, to monopolize any part of the trade or commerce among the several states, or with foreign nations, shall be deemed guilty of a felony, and, on conviction thereof, shall be punished by a fine not exceeding $1,000,000 if a corporation, or, if any other person, $100,000 or by imprisonment not exceeding three years, or by both said punishments, in the discretion of the court.
The business transactions involved in the United States Tax Court court reporting contract affect interstate commerce. National has business and property within the meaning of Section 4 of the Clayton Act, 15 U.S.C. § 15, and was injured in its business and property by reason of Alderson's antitrust violations.
3. There are two elements that must exist to find a Section 2 monopolization violation: (1) the possession of monopoly power in the relevant market, and (2) the *1018 willful acquisition or maintenance of that power as distinguished from growth or development as a consequence of a superior product, business acumen, or historic accident. United States v. Grinnell Corp., 384 U.S. 563, 571, 86 S.Ct. 1698, 1704, 16 L.Ed.2d 778 (1966).
Monopoly power has been defined as "the power to control prices or exclude competition." United States v. E.I. duPont De Nemours & Company, 351 U.S. 377, 391, 76 S.Ct. 994, 1005, 100 L.Ed. 1264 (1956).
4. In order to determine if a person, firm, or corporation has monopoly power, the relevant product and geographic markets must first be defined. J. Von Kalinowski, Antitrust Laws and Trade Regulation, § 8.02[1]; see generally United States v. Grinnell Corporation, 384 U.S. 563, 86 S.Ct. 1698, 16 L.Ed.2d 778.
5. In determining the relevant product market, the Court must examine the reasonable interchangeability of use and the cross-elasticity of demand for the product in issue. Such factors as price, quality, and consumer readiness and ability to accept reasonable alternatives must be considered. United States v. DuPont & Company, supra, 351 U.S. at 394, 396-404, 76 S.Ct. 994; United States v. Grinnell Corporation, supra, 384 U.S. at 571, 86 S.Ct. at 1704; Morton Buildings of Nebraska, Inc. v. Morton Buildings, Inc., 531 F.2d 910, 918-19 (8th Cir.1976). The Court finds that the relevant product market is four-track electronic court reporting equipment. An analysis of the unique characteristics of four-track electronic recording equipment as opposed to conventional methods of court reporting prohibits the Court from reaching a contrary conclusion. The record shows that the Tax Court found that it had experienced numerous problems with conventional type court reporting systems. Those problems were eliminated when it started using electronic recording equipment. The court found that electronic reporting had consistently produced the highest quality transcripts, particularly in the area of accuracy. The court also found that the transcript furnished by the electronic reporting equipment was not only highly accurate but was also more timely received as opposed to transcripts prepared by conventional methods. The Tax Court particularly emphasized the desirability of listening to recorded voices of the parties which enabled the court to recapture not only the exact words of the parties but also the manner in which the words were spoken. This Court, incidentally, has experimented with similar four-track court reporting equipment over the past year. The Court concludes that the relevant product market is four-track electronic court reporting equipment.
6. The relevant geographic market is the area of effective competition within which the defendant operates. United States v. DuPont & Company, 351 U.S. 377, 76 S.Ct. 994, 100 L.Ed. 1264; Morton Buildings of Nebraska, Inc. v. Morton Buildings, Inc., supra, at 918. In order to determine the relevant geographic market, the Court must examine the area or areas in which the particular firm or corporation actually conducts its business. J. Von Kalinowski, supra, § 8.02[2]. A monopoly may exist for purposes of § 2 even though limited to a narrow territory or a localized geographical area. International Boxing Club v. United States, 358 U.S. 242, 79 S.Ct. 245, 3 L.Ed.2d 270 (1959). It is unnecessary to discuss this matter in detail. The parties basically concur that the relevant geographic market is the United States Tax Court wherever it sits in the United States. Thus, as a whole, the relevant market in this antitrust action is four-track electronic court reporting systems in the United States Tax Court.
7. The issue in the instant case revolves around the existence of a "natural monopoly" in the Tax Court. A natural monopoly in the economic sense, is a monopoly resulting from economies of scale, a relationship between the size of the market *1019 and the size of the most efficient firm such that one firm of efficient size can produce all or more than the market can take at a remunerative price, and can continually expand its capacity at less cost than that of a new firm entering the business. Ovitron Corp. v. General Motors Corp., 295 F.Supp. 373, 377, n. 3 (S.D.N.Y.1969). In such a case the issue becomes "whether the possessor of natural monopoly power acquired or maintained such power through the use of means which are exclusionary, unfair, or predatory." American Football League v. National Football League, 323 F.2d 124 (4th Cir. 1963). (Emphasis added.)
8. When parties vie for a natural monopoly, mere success in driving the opponent out of such a monopoly market does not violate § 2, for it is inevitable in such a market that one competitor will succeed and one will fail. Fishman v. Wirtz, 1981-2 Trade Cases ¶ 64,378 (N.D.Ill.1981). The struggle, however, to be the sole survivor in such a narrow market is still governed by the usual rules of competition, and the victor must succeed by virtue of superior skill and acumen and by acts which are honestly industrial. Id.
9. Citing Union Leader Corp. v. Newspapers of New England, Inc., 180 F.Supp. 125 (D.Mass.1959), the court in Fishman stated that parties competing for a natural monopoly have responsibilities under the federal antitrust laws. In referring to a natural monopolist the court stated that
If the evidence shows that in laying his plans and executing them he contemplates and utilizes only superior skill, foresight, and industry, he has not an intent which is contrary to law. To prove that a person has that type of exclusionary intent which is condemned in antitrust cases there must be evidence that the person who foresees a fight to the death intends to use or actually does use unfair weapons. Fishman, supra, at 74,766-67.
10. A natural monopolist does not violate § 2 unless he "acquired or maintained his power through the use of means which are exclusionary, unfair, or predatory." Hecht v. Pro Football, Inc., 570 F.2d 982, 990 (D.C.Cir.1977).
11. Although where a natural monopoly exists, the natural monopolist is entitled to compete vigorously and fairly in a struggle for a market which cannot support more than one supplier, bidding below cost is a severely anticompetitive tactic that violates the federal antitrust laws. Ovitron Corp. v. General Motors Corp., supra, 295 F.Supp. at 378.
12. The Court finds that Alderson's below cost bidding in the instant case was predatory, anticompetitive, and a violation of § 2 of the Sherman Antitrust Act. As mentioned above, Alderson's bid actually yielded about $1.27 per original page of transcript. However, Alderson's actual costs, direct and indirect, exceeded $4.00 per page of original transcript. The record indicates that Alderson lost over $212,000 on the 1980 Tax Court contract. The record also indicates that Alderson sought to recoup those losses by increasing its 1981 bid threefold and probably would have recouped those losses but for the Tax Court's elimination of Alderson from the bidding process. If the Tax Court had not excluded Alderson from the Tax Court bidding for the 1981 contract, Alderson probably would have obtained the contract for that year because it was again the lowest bidder. The Court finds that Alderson is liable to National under § 2 of the Sherman Act for monopolization.
13. National also alleged that Alderson is liable for attempted monopolization under § 2 of the Sherman Act. An attempt to monopolize has been defined as
The employment of methods, means, and practices which would, if successful, accomplish monopolization and which though falling short, nevertheless approach so close as to create a dangerous probability of it. American Tobacco Company v. United States, 328 U.S. 781, *1020 785, 66 S.Ct. 1125, 1127, 90 L.Ed. 1575 (1946).
Having found actual monopolization, the Court easily determines that Alderson is liable for attempted monopolization under § 2 of the Sherman Act.
14. National also purports to state a cause of action of conspiracy to monopolize against Alderson. National aptly states that the necessary elements to establish a conspiracy are (1) an existence of a combination or conspiracy, (2) overt acts in furtherance of the conspiracy, (3) a substantial amount of commerce affected by the alleged conspiracy, and (4) specific intent to monopolize which can be inferred from the existence of the combination or conspiracy. 3 Von Kalinowski, Antitrust Laws and Trade Regulations, § 9.02[2]. Under this theory National asserts that Alderson conspired with other members of the National Reporting Council, Inc., to eliminate National from competition in the court reporting industry. Although an inference does exist that such is the case as National has stated it, the weight of the evidence before the Court does not support National's position under this theory. The Court specifically holds that it is unpersuaded that Alderson conspired with other members of the National Reporting Council to eliminate National from competition.
15. National seeks treble damages under 15 U.S.C. § 15. Under that section Alderson must show (1) an antitrust violation, (2) the fact of damage, (3) the relationship between the antitrust violation and the injury, and (4) the amount of damages proven to a reasonable certainty. Rosebrough Monument Company v. Memorial Park Cemetery Association, 666 F.2d 1130 (8th Cir.1981). Speculative damages are unallowable under 15 U.S.C. § 15. Id. at 1146. Although National's complaint requested $3,600,000 in damages, National's most recent pleadings seek $502,334 in damages multiplied threefold. National seeks $228,917 for the 1980 Tax Court year. National also maintains that it would have renewed the Tax Court contract the next two years and would have gained net profits of $144,435 for the 1982 year and $128,982 for the 1983 year. The Court holds that the damages are only reasonably certain in the amount of $228,917, the amount of net profits National would have received from the 1980 Tax Court contract. As National itself indicated, there was no guarantee that in 1981 it would have retained the Tax Court contract for court reporting services. But as to 1980, there were only two bidders in contention for the Tax Court contract. But for the antitrust violation of Alderson in 1980 the Court can reasonably surmise that National would have gotten the Tax Court contract for that year. The only evidence in the record that shows that National may have gotten the Tax Court contract for the years 1981 and 1982 is National's past performance from 1972 until 1980. However such evidence is not enough to rid the prospective damages that National seeks for 1981 and 1982 of their speculative nature. Therefore, the Court awards National the amount of $228,917 multiplied threefold for a total of $686,751. The Court also awards National its reasonable attorneys' fees and costs of this litigation.
16. In conclusion, the Court finds that Alderson is liable for attempted monopolization and actual monopolization in this case in violation of § 2 of the Sherman Antitrust Act, 15 U.S.C. § 2. For the Sherman Act violation the Court awards National $228,917 multiplied threefold for a total of $686,751, plus its reasonable attorneys' fees and costs of this litigation. The Court further holds that it is not persuaded that Alderson conspired with members of the National Reporting Council, Inc., to eliminate National from the court reporting competition for the United States Tax Court contract.