NATIONAL REPORTING
COMPANY, Appellee,

v.

ALDERSON REPORTING COMPANY,
INC., Appellant.

Nos. 83–1931, 84–1475.

United States Court of Appeals,
Eighth Circuit.

Submitted March 11, 1985.

Decided June 10, 1985.

Rehearing and Rehearing En Banc
Denied July 12, 1985.

Mark Arnold, St. Louis, Mo., for appellant.

Peter T. Sadoski, St. Louis, Mo., for appellee.

Before HEANEY, BRIGHT and ARNOLD, Circuit Judges.

ARNOLD, Circuit Judge.

National Reporting Company commenced this action against Alderson Reporting Company under Section 4 of the Clayton Act, 15 U.S.C. § 15 (1982), seeking damages for alleged violations of Section 2 of the Sherman Act, 15 U.S.C. § 2 (1982), and injunctive relief under Section 16 of the Clayton Act, 15 U.S.C. § 26 (1982). National claimed that Alderson attempted to and did create a monopoly in the United States Tax Court court-reporting market by submitting a predatory, below-cost bid, with the intent of driving National and other competitors out of the market.[1] The District Court held that Alderson was liable for attempted and actual monopolization in violation of Section 2 of the Sherman Act. Alderson argues in this appeal that it could not be held liable for actual monopoly because it never had the ability to control prices or exclude competition, and that it

---

1. National also claimed that Alderson conspired to monopolize the market. The District Court held that the evidence did not support a conspiracy theory, and National does not appeal that holding. The District Court's opinion is reported at 567 F.Supp. 1011 (E.D.Mo.1983).

could not be held liable for attempted monopoly because there was never a dangerous probability of success. We agree and reverse.

## I.

National Reporting Company, a Missouri corporation, was formed in June 1972 by Ronald Gore and Fred Willman, who were also its sole shareholders and officers. National was formed to provide court-reporting services with four-track tape-recording machinery in order to bid for the Tax Court court-reporting contract. Alderson Reporting Company's shareholders are Ira and Rose Ann Sharp, who took over the company from Rose Ann's father, Hal Alderson, in about March 1977. In 1972, National bid for and was awarded the court-reporting contract for the United States Tax Court.

The Tax Court has a policy of allowing contractors who perform satisfactorily to renew their contract at the previous year's price. If the contractor wishes to raise his price, the Court puts the contract out for bids. In 1973 the Tax Court renewed its contract with National, but in 1974 the contract was again put out for bids. The Tax Court rejected all of the bids and then changed the contract specifications.

Before 1974, Tax Court specifications for court-reporting contracts allowed all methods of court reporting, including stenograph, stenotype, shorthand, stenomask, and electronic. In 1974 the Tax Court amended its specifications to permit only four-track electronic recorders with another set of four-track recorders as back-up, and to require that at least 90 per cent. (90%) of the work be performed by employees of the primary contractor. Proofreading was required to be done against the tape, and not by simply proofreading the printed transcript. National was the only company then able to meet the new specifications and was awarded the 1974 contract. The Tax Court renewed its contract with National every year from 1974 to 1980 at the 1974 price of $1.07 per page.

In 1980 National decided it had to raise its prices, so the Tax Court let the contract out again for bids. National and Alderson were the only two companies to bid for the contract; there were, however, at least six other companies, Acme, North American, Neal Gross, Miller, ITS, and Columbia, able to provide four-track electronic reporting in 1980. Tr. 327–28, 599.

Alderson's bid was much lower than National's. Alderson bid 50 cents per page for regular cases and 36 cents per page for small cases. National bid $1.60 per page for both types of cases. Alderson was awarded the contract. The Tax Court contract was the only work National had at that time: National went out of business shortly after losing it.

Alderson performed poorly on the contract, and the next year the Tax Court again let the contract out for bidding. Alderson bid again; although it almost tripled its bid from the prior year, it was still the lowest bidder. The Tax Court, however, determined that Alderson was an irresponsible bidder because of its inadequate performance on the 1980 contract, and awarded the 1981 contract to Acme Reporting.

National brought this lawsuit against Alderson alleging that Alderson used predatory, or below-cost, pricing in order to drive National out of business and then capture a monopoly over the Tax Court court-reporting market. The District Court agreed with National. It held that Alderson's bidding below cost was severely anticompetitive and a violation of Section 2 of the Sherman Act. The Court held that National was damaged in the amount of $228,917, and awarded treble damages of $686,751, plus attorneys' fees.

## II.

The first step in analyzing this case is a determination of the relevant market. The relevant market is determined by looking at two separate components: the relevant geographic market and the relevant product market. The parties agree that the relevant geographic market is the United States Tax Court. The District Court defined the relevant product market as

four-track electronic reporting equipment. Alderson suggests that the District Court intended to define the relevant product market as the provision of court-reporting services to the United States Tax Court, Appellant's Brief at 9 n. 5, because Alderson and National provided services to the Tax Court, not equipment. For purposes of this decision, we accept the relevant market as defined by the District Court and refined by Alderson.

█ National argues that Alderson bid far below cost, knew its bid was far below cost, and did not care if it lost money, because it would attempt to recover its losses in subsequent years after gaining the Tax Court "natural monopoly" market. Conversely, Alderson says that it intended and expected to make a profit, but unforeseen circumstances frustrated this goal. Alderson points out that even National lost money the first year it had the contract. Alderson explained that its bid was so much less than National's because it feared it would be undercut by Acme. Alderson argues that its bid was so far below National's that it cannot be viewed as having been aimed at National.

In Areeda & Turner, *Predatory Pricing and Related Practices Under Section 2 of The Sherman Act*, 88 Harv.L.Rev. 697, 698 (1975), the act of predatory pricing is defined as follows:

> [P]redation in any meaningful sense cannot exist unless there is a temporary sacrifice of net revenues in the expectation of greater future gains.... [T]he classically-feared case of predation has been the deliberate sacrifice of present revenues for the purpose of driving rivals out of the market and then recouping the losses through higher profits earned in the absence of competition.

Even if we assume that Alderson's pricing was predatory as so defined, and even if we assume predatory intent, there is no evidence that Alderson ever possessed monopoly power. Alderson did not have the power to raise prices or eliminate competitors, see *United States v. E.I. du Pont de Nemours & Co.*, 351 U.S. 377, 391, 76 S.Ct.

994, 1004, 100 L.Ed. 1264 (1956), so it could never "[recoup] losses though higher profits earned in the absence of competition." 88 Harv.L.Rev. at 698.

The District Court found that the Tax Court has a policy of renewing the court-reporting contract for those who perform satisfactorily and who are willing to continue at the same price. If the contractor wishes to raise its prices, the contract goes out for bidding again. As soon as the contract goes back up for bids, there are numerous other court-reporting companies who can bid and try to undercut the company holding the contract. Alderson could not control prices, because if it tried to raise its price, the contract would again be up for bids. Both parties agree that Alderson could not exclude any company from bidding, and by 1980 there were several other companies capable of meeting the Tax Court court-reporting contract requirements. Competition was alive and well in the relevant market.

█ National insists that the relevant market here—the provision of four-track electronic court-reporting services for the Tax Court—is a "natural monopoly," and that, accordingly, legal standards somewhat different from the ordinary should apply. For present purposes, we accept National's proffered definition of "natural monopoly," as set out in *Ovitron Corp. v. General Motors Corp.*, 295 F.Supp. 373, 377 n. 3 (S.D.N.Y.1969) (quoting Kaysen and Turner, Antitrust Policy 191 (1959)):

> █ monopoly resulting from economics of scale, a relationship between the size of the market and the size of the most efficient firm such that one firm of efficient size can produce all or more than the market can take at a remunerative price, and can continually expand its capacity at less cost than that of a new firm entering the business. In this situation, competition may exist for a time but only until bankruptcy or merger leaves the field to one firm, in a meaningful sense, competition is self-destructive.

To put this definition in short-hand form, a natural monopoly is a market that can

practically accommodate only one competitor. Obviously it cannot be a violation of law to *be* that one competitor, so long as the company in question has attained its success in the market by business acumen, superior quality, or other means "honestly industrial." See *United States v. Aluminum Co. of America,* 148 F.2d 416, 429–30 (2d Cir.1945) (L. Hand, J.). National argues, however, that if a natural monopolist has attained its position by unfair means, for example, predatory pricing, then it is guilty of a violation of Section 2 even though the market is a natural monopoly.

■ We may accept this argument, at least in theory, for present purposes, but it does not get National to the desired point. A number of companies have provided electronic court-reporting services to the Tax Court over the years. The market is not a natural monopoly in the sense that it can accommodate, for practical purposes, only one competitor. Each year the market is again thrown open, unless the existing contractor is performing satisfactorily and agrees to continue at the same price. This very condition, as we have seen, negates the "power over price" that is the hallmark of illegal monopolization. If the District Court had found that each one-year contract for the provision of four-track electronic court-reporting services to the Tax Court is a separate market, a different question would be presented, but it did not so find. In short, we assume for present purposes that Alderson did obtain a one-year contract by unfair or predatory means. This may be a violation of some law, perhaps the common law of unfair competition, but it is not a violation of Section 2 of the Sherman Act, because there is no finding below, nor any contention on appeal, that each separate year constitutes a discrete market, and the complaint pleads only a violation of Section 2 of the Sherman Act.

■ National also argues that it does not matter whether Alderson actually obtained monopoly power. In a natural-monopoly situation, it is contended, a defendant may be liable under Section 2 without proof of market dominance or monopoly. Certainly a company can conspire to monopolize (a theory rejected by the District Court and not before us on this appeal), or attempt to monopolize (a theory we shall discuss shortly), without actually attaining market dominance or monopoly power. But it may not be found guilty of completed monopolization in violation of Section 2 without such proof. The first question in a Section 2 case, after the product and geographic markets have been defined, is whether the defendant has monopoly power—whether he can control the price and exclude competition in the relevant market. *United States v. E.I. du Pont de Nemours & Co., supra,* 351 U.S. at 380, 76 S.Ct. at 998. The next question is how the power was acquired, and here, a defendant can be liable, even in a natural-monopoly situation, if the power has been acquired by improper means. See *American Football League v. National Football League,* 323 F.2d 124, 131 (4th Cir.1963). A finding of actual acquisition of monopoly power or market dominance is an essential prerequisite before completed monopolization in violation of Section 2 can be found.

In support of its position, National quotes the following passage from *Hiland Dairy, Inc. v. Kroger Co.,* 402 F.2d 968, 976 (8th Cir.1968), *cert. denied,* 395 U.S. 961, 89 S.Ct. 2096, 23 L.Ed.2d 748 (1969):

> Market dominance or monopoly is not a prerequisite in this type of case because the acts complained of, even if lawful, have an unreasonable restraint on trade and unduly hinder the free flow of competition.

The statement is probably dictum. It occurs at the end of a passage in the opinion distinguishing certain cases cited by an unsuccessful plaintiff. But even if it is a holding, it is not, in context, a holding that one may be guilty of completed monopolization in violation of Section 2 without having attained market dominance or monopoly power. The reference in the Court's opinion in *Hiland* to "this type of case" seems to mean cases in which agreements, combinations, or conspiracies in violation of Section 1 of the Sherman Act are alleged. And of course a violation of Section 1 may

occur whether or not market dominance or monopoly power is actually attained. That Section, however, requires a concert of action. A single company or entity, without agreement or combination with others, cannot be in violation of Section 1. Here, only Alderson is named as a defendant, only a violation of Section 2 was found by the District Court, and even in the context of that Section the plaintiff's claim of conspiracy or agreement has been rejected.

■ We conclude, accepting as true all of the findings of the District Court as to the relevant geographic and product market and as to the predatory nature of Alderson's conduct, that the essential prerequisite of power over price has not been established, and that the holding of violation of Section 2 of the Sherman Act in the sense of a completed monopolization cannot stand.

■ The District Court also held that Alderson was liable for attempted monopolization, though apparently only because it had already determined that Alderson was liable for actual monopolization. Since we have reversed the monopolization holding, we must examine separately the elements of attempted monopolization.

> In order to establish an "attempt to monopolize ... any part of the trade or commerce among the several states ..." under 15 U.S.C. § 2 [National] was required to show [Alderson's] specific intent to monopolize and a dangerous probability of success within [the] relevant product and geographic market.

*United States v. Empire Gas Corp.*, 537 F.2d 296, 298–99 (8th Cir.1976), *cert. denied*, 429 U.S. 1122, 97 S.Ct. 1158, 51 L.Ed.2d 572 (1977).

National contends that several facts point to Alderson's specific intent to monopolize the market: (1) Alderson attempted to buy out National; (2) Ira Sharp wrote two letters to the Clerk of the Tax Court containing criticism of National; (3) the National Reporting Council, an organization of court-reporting companies to which Alderson belonged and National did not, protested the Tax Court's new specifications; and (4) Alderson engaged in predatory pricing without concern for how much money it lost.

We have no need to pass on Alderson's intent, because even if Alderson specifically intended to monopolize the Tax Court court-reporting market, there was never a dangerous probability of success. Although Alderson held the contract for 1980, it lost it in 1981 because it performed so poorly in 1980 that it was determined to be an irresponsible bidder. By 1981 there were two court-reporting companies, Acme and Neal Gross, new to the Tax Court court-reporting market, bidding for the contract. Alderson's having lost the contract so soon after receiving it, its inability to raise prices without undergoing another bidding process, and the presence of even more competition in the market, show how small Alderson's chance was of successfully monopolizing the market. In short, we conclude that there was no dangerous probability that Alderson could acquire the ability to control prices or competition in the Tax Court court-reporting market. The District Court's holding that Alderson is liable for attempted monopolization cannot stand.

The judgment is reversed, and the cause remanded with directions to dismiss the complaint with prejudice.