ASSAM DRUG CO., INC., Downtown, Inc., d/b/a Shoppers City Liquor of Mitchell, S.D., Appellants,

v.

MILLER BREWING CO., INC., Appellee.

No. 86–5049.

United States Court of Appeals, Eighth Circuit.

Submitted June 10, 1986.

Decided Aug. 12, 1986.

Rick Johnson, Gregory, S.D., for appellants.

Jerome Chapman, Washington, D.C., for appellee.

Before WOLLMAN, Circuit Judge, FLOYD R. GIBSON, Senior Circuit Judge, and LARSON,* Senior District Judge.

WOLLMAN, Circuit Judge.

Assam Drug Co., Inc., and Downtown, Inc., appeal the district court's [1] grant of summary judgment in their action against Miller Brewing Company, Inc., seeking damages and injunctive relief for alleged violations of South Dakota antitrust law. Assam and Downtown claimed that Miller restrained trade by its use of a distributor agreement defining exclusive territories where distributors may market Miller products. The district court, in granting Miller's motion for summary judgment, found that Miller had no power in the relevant market. The issue in this appeal is whether summary judgment should be granted in an antitrust case of vertical nonprice restraint where the plaintiff has not shown that the defendant has market power.

I

Assam Drug Co. and Downtown, Inc., are corporations under the common ownership of a single family. Assam is located at Sioux Falls, South Dakota, and Downtown is located at Mitchell, South Dakota. Both corporations are retail sellers of beer and other alcoholic beverages. Miller Brewing Company produces and sells beer, which it distributes through a national network of more than 700 independent distributors.

---

* The HONORABLE EARL R. LARSON, Senior United States District Judge for the District of Minnesota, sitting by designation.

1. The Honorable John B. Jones, United States District Judge for the District of South Dakota.

Beginning in 1976, Assam and Downtown bought their Miller products through Brewster Distributing Company, a Watertown, South Dakota, distributor. Assam and Downtown chose to obtain their Miller products in Watertown because Brewster offered a lower price and an attractive discounting policy. In May 1983 Miller entered into a revised distributor agreement with Brewster and its other distributors. Prior distributor agreements used by Miller had assigned each distributor an area of primary responsibility but did not prohibit sales outside that area. Under the new distributor agreement, Brewster was appointed the sole Miller distributor for a limited geographical area.[2] The area assigned to Brewster excluded Sioux Falls and Mitchell, the respective locations of Assam and Downtown.[3] Consequently, Brewster discontinued selling Miller products to Assam and Downtown in order to comply with the distributor agreement.

Assam and Downtown sued Miller in South Dakota state court alleging that the exclusive territory provision of the distributor agreement violated South Dakota antitrust law. Assam and Downtown alleged that, as a result of the distributor agreement, competition in the sale of beer in South Dakota had been reduced and, more specifically, that Assam and Downtown were paying higher prices for beer than they had previously paid to Brewster.

Miller removed the action to the federal district court. After a year of discovery, Miller moved for summary judgment. Miller claimed that Assam and Downtown had failed to establish the threshold legal requirement of Miller's market power.[4] The district court agreed with Miller. *Assam Drug Co. v. Miller Brewing Co.*, 624 F.Supp. 411 (D.S.D.1985). The court found that "the market power test is analytically sound and consistent with * * * pro-competitive values," *id.* at 413, concluded that "it is clear that defendant does not possess market power in the product market relevant to this case," *id.* at 414, and granted summary judgment for Miller.

## II

## A

Although Assam and Downtown brought this suit under South Dakota antitrust law, S.D. Codified Laws § 37–1–3.1 (1977), our analysis does not differ significantly from that applied to actions brought under the federal antitrust laws. The South Dakota statutory language governing restraint of trade [5] is similar to section one of the Sherman Act,[6] and the South Dakota legislature has indicated that federal court interpretations of the federal antitrust laws may be used as a guide in interpreting the state law. S.D. Codified Laws § 37–1–22 (1977).

2. Paragraph 2(a) of the distributor agreement provides in part: "Miller hereby appoints Distributor as its sole distributor within the geographic area described in the Distributor Data Sheet ('Distributor's Area') for the Miller products listed in the Distributor Data Sheet ('Miller products'). Unless Miller has granted its prior written approval, Distributor shall not sell or supply Miller products to any retail location within another authorized Miller distributor's area nor to any person Distributor has reason to believe will sell or supply all or part of such products to any retail location within another authorized Miller distributor's area."

3. The distributor's area was designated as the South Dakota counties of Clark, Codington, Deuel, and Hamlin; the towns of Stockholm, Strandburg, LaBolt, Albee, and Revillo in Grant County; the towns of Badger and Erwin in Kingsbury County; and the towns of Conde, Turton, and Doland in Spink County.

4. Miller also asserted that Assam and Downtown had failed to show any injury to competition, as contrasted with only an injury to themselves, from the distributor agreement. The district court did not reach this issue, and, in light of our disposition of the market power issue, neither do we.

5. S.D. Codified Laws § 37–1–3.1 (1977) provides in part: "A contract, combination, or conspiracy between two or more persons in restraint of trade or commerce any part of which is within this state is unlawful."

6. Section one of the Sherman Act, 15 U.S.C. § 1 (1982), provides in part: "Every contract, combination in the form of trust or otherwise, or conspiracy, in restraint of trade or commerce among the several states, or with foreign nations, is declared to be illegal."

Furthermore, the South Dakota Supreme Court has stated that in construing the state law "great weight should be given to the federal cases interpreting the federal statute." *Byre v. City of Chamberlain*, 362 N.W.2d 69, 74 (S.D.1985).

### B

The central issue in this case is whether we should adopt a threshold requirement of market power for antitrust cases involving vertical nonprice restraints. Our analysis of this issue requires a brief background review of the antitrust treatment of vertical nonprice restraints.

The antitrust laws, both South Dakota and federal, contain broad prohibitions of "restraint of trade." 15 U.S.C. § 1 (1982); S.D. Codified Laws § 37–1–3.1 (1977). But because it might be said that virtually all basic business arrangements restrain trade in some manner, the Supreme Court has confined the scope of the law to activity that unreasonably restrains trade. *Standard Oil Co. v. United States*, 221 U.S. 1, 60, 31 S.Ct. 502, 515, 55 L.Ed. 619 (1911). These restraints are judged by two standards. First, "there are certain agreements or practices which because of their pernicious effect on competition and lack of any redeeming virtue are conclusively presumed to be unreasonable and therefore illegal without elaborate inquiry as to the precise harm they have caused or the business excuse for their use." *Northern Pa-*

*cific Railway v. United States*, 356 U.S. 1, 5, 78 S.Ct. 514, 518, 2 L.Ed.2d 545 (1958). Restraints of this type are categorized as *per se* violations of the law. The *per se* category is reserved for those activities that are "plainly anticompetitive." *National Society of Professional Engineers v. United States*, 435 U.S. 679, 692, 98 S.Ct. 1355, 1365, 55 L.Ed.2d 637 (1978). Restraints the effects of which are not so immediately apparent are judged under a second standard, the rule of reason.[7] Under the rule of reason "the factfinder weighs all of the circumstances of a case in deciding whether a restrictive practice should be prohibited as imposing an unreasonable restraint on competition." *Continental T.V., Inc. v. GTE Sylvania Inc.*, 433 U.S. 36, 49, 97 S.Ct. 2549, 2557, 53 L.Ed.2d 568 (1977).

The territorial restraint that we evaluate in this case is known as a vertical nonprice restraint.[8] Vertical restraints are those imposed by persons or firms that are above the restrained person or firm in the chain of distribution.[9] The antitrust treatment of vertical nonprice restraints has a lively past. In *White Motor Co. v. United States*, 372 U.S. 253, 83 S.Ct. 696, 9 L.Ed.2d 738 (1963), a case that the Supreme Court described as its "first case involving a territorial restriction in a vertical arrangement," *id.* at 261, 83 S.Ct. at 701 (emphasis omitted), the Court refused to apply a *per se* rule to vertical nonprice

---

7. The opinion of Mr. Justice Brandeis in *Chicago Board of Trade v. United States*, 246 U.S. 231, 38 S.Ct. 242, 62 L.Ed. 683 (1918), is sometimes referred to as the classic statement of the rule of reason:

 The true test of legality is whether the restraint imposed is such as merely regulates and perhaps thereby promotes competition or whether it is such as may suppress or even destroy competition. To determine that question the court must ordinarily consider the facts peculiar to the business to which the restraint is applied; its condition before and after the restraint was imposed; the nature of the restraint and its effect, actual or probable. The history of the restraint, the evil believed to exist, the reason for adopting the particular remedy, the purpose or end sought to be attained, are all relevant facts.

 *Id.* at 238, 38 S.Ct. at 243.

8. The distinction between a vertical nonprice restraint and a vertical price restriction is an important one. The Supreme Court has made it clear that price restrictions are *per se* illegal while nonprice restraints are evaluated under the rule of reason. *Sylvania*, 433 U.S. at 51 n. 18, 97 S.Ct. at 2558 n. 18. We are concerned here only with vertical nonprice restraints.

9. Horizontal restraints, on the other hand, are agreements among competitors that restrain competition among persons or firms at the same level of distribution. Horizontal restraints are ordinarily illegal *per se*. *See, e.g., United States v. Topco Associates, Inc.*, 405 U.S. 596, 608, 92 S.Ct. 1126, 1133, 31 L.Ed.2d 515 (1972); *United States v. Sealy, Inc.*, 388 U.S. 350, 357–58, 87 S.Ct. 1847, 1852–53, 18 L.Ed.2d 1238 (1967).

restraints.[10] Four years later in *United States v. Arnold, Schwinn & Co.*, 388 U.S. 365, 87 S.Ct. 1856, 18 L.Ed.2d 1249 (1967), the Court held that "[o]nce the manufacturer has parted with title and risk, he has parted with dominion over the product, and his effort thereafter to restrict territory or persons to whom the product may be transferred—whether by explicit agreement or by silent combination or understanding with his vendee—is a *per se* violation of § 1 of the Sherman Act." *Id.* at 382, 87 S.Ct. at 1867. The *per se* rule announced in *Schwinn* was rejected, however, in *Continental T.V., Inc. v. GTE Sylvania Inc.*, 433 U.S. 36, 97 S.Ct. 2549, 53 L.Ed.2d 568 (1977). The *Sylvania* Court found that the rule of reason was the more appropriate test of the legality of vertical nonprice restraints. *Id.* at 59, 97 S.Ct. at 2562.

The *Sylvania* Court undertook a complete reexamination of the *per se* approach to vertical restraints, basing much of its analysis on the market impact of vertical restrictions. The Court noted that vertical restraints have the "potential for a simultaneous reduction of intrabrand competition and stimulation of interbrand competition." [11] *Id.* at 51–52, 97 S.Ct. at 2558. Vertical restraints may reduce intrabrand competition "by limiting the number of sellers of a particular product competing for the business of a given group of buyers." *Id.* at 54, 97 S.Ct. at 2559. On the other hand, vertical restraints may enhance inter-

brand competition "by allowing the manufacturer to achieve certain efficiencies in the distribution of his products." *Id.* Specifically, the Court noted at least three ways that vertical restraints may enhance interbrand competition: (1) new manufacturers and manufacturers entering new markets can use the restrictions to induce retailers to invest in capital and labor to the extent required to distribute products unknown to the consumer, *id.* at 55, 97 S.Ct. at 2560; (2) manufacturers can use the restrictions to induce retailers to engage in promotional activities or provide service and repair facilities, *id.*; and (3) manufacturers can use the restrictions to ensure product quality and safety. *Id.* at 55 n. 23, 97 S.Ct. at 2560 n. 23. Because of their potential for procompetitive effects, *Sylvania* held that vertical nonprice restraints should be tested by the rule of reason.[12]

## C

 The vertical nonprice restraint at issue in this case is plainly subject to evaluation under the rule of reason. *Continental T.V., Inc. v. GTE Sylvania Inc.*, 433 U.S. 36, 97 S.Ct. 2549, 53 L.Ed.2d 568 (1977). The rule of reason, however, is a vacuous standard and as such it provides little concrete direction for evaluating the competitive effects of a challenged restraint.[13] Some courts have narrowed the

---

**10.** The *White Motor* Court stated that:

We do not know enough of the economic and business stuff out of which these arrangements emerge to be certain. * * * We need to know more than we do about the actual impact of these arrangements on competition to decide whether they have such a "pernicious effect on competition and lack ... any redeeming virtue" (*Northern Pac. R. Co. v. United States, supra*, p. 5 [of 356 U.S., p. 518 of 18 S.Ct.]) and therefore should be classified as *per se* violations of the Sherman Act. 372 U.S. at 263, 83 S.Ct. at 702.

**11.** "Interbrand competition is the competition among the manufacturers of the same generic product * * * [I]ntrabrand competition is the competition between the distributors—wholesale or retail—of the product of a particular manufacturer." *Sylvania*, 433 U.S. at 52 n. 19, 97 S.Ct. at 2558 n. 19.

**12.** Some commentators have since gone so far as to suggest that purely vertical restrictions on intrabrand competition, both price and nonprice, should be legal *per se*. Posner, *The Next Step in the Antitrust Treatment of Restricted Distribution: Per Se Legality*, 48 U.Chi.L.Rev. 6, 25 (1981); *see also* Bork, *Vertical Restraints: Schwinn Overruled*, 1977 Sup.Ct.Rev. 171, 190–92. At least one of these commentators has referred to the market power approach, which we adopt today, as only a "sound interim measure" preceding the adoption of *per se* legality. Posner, *supra*, at 25.

**13.** The *Sylvania* Court did not apply the rule of reason to the facts of that case, and its explanation of the rule was limited to repeating the statement of the rule in *Chicago Board of Trade v. United States*, 246 U.S. 231, 238, 38 S.Ct. 242, 243, 62 L.Ed. 683 (1918), which we have quoted *supra* at note 7. 433 U.S. at 49 n. 15, 97 S.Ct. at

unlimited inquiry necessary under the rule of reason by requiring at the threshold that the plaintiff attacking a vertical nonprice restraint prove the defendant's substantial market power in a relevant market. *See, e.g., Rothery Storage & Van Co. v. Atlas Van Lines, Inc.,* 792 F.2d 210, 221 (D.C. Cir.1986); *General Leaseways, Inc. v. National Truck Leasing Association,* 744 F.2d 588, 596 (7th Cir.1984); *Graphic Products Distributors, Inc. v. Itek Corp.,* 717 F.2d 1560, 1568–69 (11th Cir.1983); *Davis-Watkins Co. v. Service Merchandise,* 686 F.2d 1190, 1202 (6th Cir.1982), *cert. denied sub nom. Service Merchandise Co. v. Amana Refrigeration, Inc.,* 466 U.S. 931, 104 S.Ct. 1718, 80 L.Ed.2d 190 (1984); *Valley Liquors, Inc. v. Renfield Importers, Ltd.,* 678 F.2d 742, 745 (7th Cir.1982); *Muenster Butane, Inc. v. Stewart Co.,* 651 F.2d 292, 298 (5th Cir.1981); *O.S.C. Corp. v. Apple Computer, Inc.,* 601 F.Supp. 1274, 1291 n. 8 (C.D.Cal.1985), *aff'd,* 792 F.2d 1464 (9th Cir.1986). The theory of the market power approach has been explained by Professor, now Judge, Posner:

> The absence of market power in the interbrand market implies that the defendant is in competition with firms that sell

products regarded by the consumer as close substitutes for the defendant's. The defendant therefore will lose most or all of its sales if its retail price exceeds its competitors' retail price for any reason, including a lack of intrabrand competition that drives its costs of distribution up. To put the point slightly differently, if a firm lacks market power, it cannot affect the price of its product; that price is determined by the market.

Posner, *supra* note 12, at 16. The Supreme Court has instructed that "[i]nterbrand competition * * * is the primary concern of antitrust law." *Sylvania,* 433 U.S. at 52 n. 19, 97 S.Ct. at 2558 n. 19. Firms lacking market power, if they wish to survive, cannot adopt restraints that have anticompetitive effects. Thus such firms cannot have an effect on interbrand competition. Consequently, a finding of no market power precludes any need to further balance the competitive effects of a challenged restraint.[14]

We conclude that the market power approach is sound and economically consistent with the application of the rule of reason and evaluation of vertical nonprice restraints as explained in *Sylvania.*[15] The

2557 n. 15. We are not the first to note the lack of guidance provided by the rule of reason. *See, e.g., Graphic Products Distributors, Inc. v. Itek Corp.,* 717 F.2d 1560, 1568 (11th Cir.1983); Posner, *supra* note 12, at 7, 14–15; Pitofsky, *The Sylvania Case: Antitrust Analysis of Non-Price Vertical Restrictions,* 78 Colum.L.Rev. 1, 11 (1978).

**14.** Nothing in this court's decision in *National Reporting Co. v. Alderson Reporting Co.,* 763 F.2d 1020 (8th Cir.1985), is contrary to our decision here. The *National Reporting* court stated in dicta, discussing a statement from *Hiland Dairy, Inc. v. Kroger Co.,* 402 F.2d 968 (8th Cir.1968), *cert. denied,* 395 U.S. 961, 89 S.Ct. 2096, 23 L.Ed.2d 748 (1969), that itself is "probably dictum," 763 F.2d at 1024, that "of course a violation of section 1 may occur whether or not market dominance or monopoly power is actually attained." 763 F.2d at 1024–25. Both *National Reporting* and *Hiland Dairy* were monopolization cases and the language from them that is brought to our attention here was directed in both cases at *per se* violations.

Furthermore, no case cited to us by the plaintiffs squarely considers and rejects the market power approach. Although *Eiberger v. Sony*

*Corp.,* 622 F.2d 1068 (2d Cir.1980), could be characterized as having negative implications for the market power approach, *see id.* at 1080–81, another Second Circuit case, *Oreck Corp. v. Whirlpool Corp.,* 579 F.2d 126 (2d Cir.1978) (en banc), *cert. denied,* 439 U.S. 946, 99 S.Ct. 340, 58 L.Ed.2d 338 (1979), reads more positively toward the approach. Neither case, however, addresses the approach directly. *Harold Friedman Inc. v. Thorofare Markets Inc.,* 587 F.2d 127 (3d Cir.1978), a case concerning a restrictive covenant in a shopping center lease, stated that "no single aspect is dispositive," *id.* at 143, but the court explicitly distinguished the claim before it from claims concerning territorial restrictions on resale imposed on distributors by manufacturers. *Id.* And again, the market power approach was not directly considered by the court in *Harold Friedman.*

**15.** In reaching this conclusion we are mindful of the continuing concern over the role of economic analysis in the antitrust field. This court itself has not been immune from the debate. *See Paschall v. Kansas City Star Co.,* 727 F.2d 692, 706 (8th Cir.) (en banc) (Heaney, J., dissenting), *cert. denied,* — U.S. —, 105 S.Ct. 222, 83 L.Ed.2d 340 (1984). However, as the

theory of the approach as applied to this case is that Miller is in competition with other firms selling beers that are close substitutes for Miller beer. Miller would lose sales if any price increase resulted from reduced intrabrand competition growing out of the territorial restraint. Unless Miller has market power, market forces would compel it to employ territorial restraints only if the restraints had no depressive effect on sales. Thus, market power becomes the crucial issue because without it reduced intrabrand competition cannot have a parallel effect on interbrand competition.

## III

■ Having determined that the market power approach is appropriate and useful in evaluating vertical nonprice restraints, we turn to the question of whether it is an appropriate basis for summary judgment.

Although summary procedures should be used "sparingly" in antitrust litigation, *Poller v. Columbia Broadcasting System, Inc.*, 368 U.S. 464, 473, 82 S.Ct. 486, 491, 7 L.Ed.2d 458 (1962), that concern is greatest "where motive and intent play leading roles." *Id.* at 473, 82 S.Ct. at 491. Summary judgment is not precluded in antitrust litigation. 10A C. Wright, A. Miller, & M. Kane, *Federal Practice and Procedure* § 2732.1 (2d ed. 1983). This court has upheld summary judgments in antitrust cases. *See, e.g., Impro Products, Inc. v. Herrick*, 715 F.2d 1267, 1276, 1280 (8th Cir.1983), *cert. denied*, 465 U.S. 1026, 104 S.Ct. 1282, 79 L.Ed.2d 686 (1984); *Admiral Theatre Corp. v. Douglas Theatre Co.*, 585 F.2d 877, 889–90 (8th Cir.1978); *Willmar Poultry Co. v. Morton-Norwich Products, Inc.*, 520 F.2d 289, 293–94 (8th Cir.1975) ("where there has been ample opportunity for discovery, summary judgment is appropriate in antitrust litigation"), *cert. denied*, 424 U.S. 915, 96 S.Ct. 1116, 47 L.Ed.2d 320 (1976). The Supreme Court noted in *First*

*National Bank v. Cities Service Co.*, 391 U.S. 253, 290, 88 S.Ct. 1575, 1593, 20 L.Ed.2d 569 (1968):

> While we recognize the importance of preserving litigants' rights to a trial on their claims, we are not prepared to extend those rights to the point of requiring that anyone who files an anti-trust complaint setting forth a valid cause of action be entitled to a full-dress trial notwithstanding the absence of any significant probative evidence tending to support the complaint.

Recently, the Court again demonstrated the availability of summary judgment in antitrust cases when it reversed a court of appeals reversal of a district court grant of summary judgment in an antitrust case involving conspiracy issues. *Matsushita Electric Industrial Co. v. Zenith Radio Corp.*, —— U.S. ——, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986). The *Matsushita* Court noted the relevance of economic realities in evaluating summary judgment motions, stating that "if the factual context renders respondents' claim implausible—if the claim is one that simply makes no economic sense—respondents must come forward with more persuasive evidence to support their claim than would otherwise be necessary." *Id.* 106 S.Ct. at 1356. Because a showing of market power is a threshold requirement to challenging a vertical nonprice restraint, a defendant who establishes, in accordance with the rules governing summary judgment, that it lacks market power a fortiori establishes that no genuine issue of material fact exists and is entitled to entry of judgment in its favor as a matter of law. Fed.R.Civ.P. 56(c).

## IV

Having adopted the market power approach and having determined that it is an appropriate basis for summary judgment, we now review the district court's finding that Miller had no market power. Because this action is here on appeal of the district

Supreme Court stated in *Sylvania*, "an antitrust policy divorced from market considerations would lack any objective benchmarks." 433 U.S. at 53 n. 21, 97 S.Ct. at 2559 n. 21. More-

over, economic reasoning is widely employed in antitrust, particularly in the formation of *per se* rules. *See* Bork, *supra* note 12, at 178.

court's grant of Miller's motion for summary judgment, Assam[16] must be given the benefit of every favorable inference that may be drawn from the evidence. *Buford v. Tremayne,* 747 F.2d 445, 447 (8th Cir. 1984). Summary judgment is proper only when there is no genuine issue of material fact so that the case may be decided as a matter of law. *Id.*

 In order to establish that the defendant has market power, the plaintiff must show that the defendant has a dominant market share in a well-defined relevant market. *Graphic Products Distributors,* 717 F.2d at 1569 (quoting *Cornwell Quality Tools Co. v. C.T.S. Co.,* 446 F.2d 825, 829 (9th Cir.1971), *cert. denied,* 404 U.S. 1049, 92 S.Ct. 715, 716, 30 L.Ed.2d 740 (1972)); Posner, *supra* note 12, at 16. The market must be defined in terms of both product and geography. *Valley Liquors,* 678 F.2d at 745. The district court, guided by the affidavit of Miller Assistant Secretary and Assistant General Counsel Carroll A. Bodie, an affidavit submitted by Miller in support of its motion for summary judgment, referred to "the interbrand beer market in South Dakota," *Assam Drug,* 624 F.Supp. at 414, as the relevant product and geographical market. Because Assam has not at any time contested that the "interbrand beer market" is the relevant product market here, we find no issue as to that fact. There has, however, been some confusion over the relevant geographical market. Although at various points in the proceedings in the trial court Assam asserted that the relevant geographical market is eastern South Dakota, eastern South Dakota and adjoining areas in Minnesota and Iowa, or the entire state of South Dakota, Assam has not on appeal challenged the district court's designation of South Dakota as the relevant geographical market. Even had it done so, the Bodie affidavit accepted by the district court shows that Miller's market share did not vary significantly in any of the markets asserted by Assam throughout this litigation.[17] Consequently, the record admits of no inference for Assam on the geographical market issue that would raise an issue of fact.

The district court, again relying on the Bodie affidavit, found that Miller's market share in the interbrand beer market in South Dakota was 19.1%.[18] Assam's response to this figure, contained in its response to Miller's motion for summary judgment, was that it was a "self-serving statistical conclusion[ ] by Miller of which the plaintiffs have no knowledge." Plaintiff's Response to Miller's Statements of Material Fact, Designated Record at 209, 210. Assam argues on appeal, however, that certain deposition statements of an owner of Assam create an issue as to market share.[19]

---

**16.** In this section and the next we refer to Assam and Downtown collectively as "Assam."

**17.** According to the Bodie affidavit, Miller's market share was 19.6% in eastern South Dakota, 17.7% in eastern South Dakota and adjoining areas in Minnesota and Iowa, and 19.1% in the entire state of South Dakota. The market share figures in the Bodie affidavit were derived from shipment figures reported by brewers to state agencies and from records of sales by Miller distributors. The figures are for the period from July 1, 1984, to June 30, 1985.

**18.** The district court concluded that Miller's 19.1% market share did not constitute market power under the circumstances of this case. Assam has not provided any basis for an argument, given a market share of 19.1%, that Miller does have market power. The district court conclusion is consistent with numerous similar determinations in other cases. *See, e.g., Graph-*

ic *Products Distributors, Inc. v. Itek Corp.,* 717 F.2d 1560, 1568–71 (11th Cir.1983) (70–75% market share constitutes market power); *Donald B. Rice Tire Co. v. Michelin Tire Corp.,* 483 F.Supp. 750 (D.Md.1980) (20–25% market share does not constitute market power), *aff'd,* 638 F.2d 15 (4th Cir.), *cert. denied,* 454 U.S. 864, 102 S.Ct. 324, 70 L.Ed.2d 164 (1981); *O.S.C. Corp. v. Apple Computer, Inc.,* 601 F.Supp. 1274 (C.D. Cal.1985) (up to 20% market share does not constitute market power where substantial competition exists), *aff'd,* 792 F.2d 1464 (9th Cir. 1986). Furthermore, Miller's market share had been declining since well before the date of the distributor agreement at issue here and two competing brewers had larger market shares than Miller.

**19.** Plaintiffs rely on these statements by Fred Assam:
 Q: How do you decide what beers to put on promotion at Assam Drug?

A party opposing a motion for summary judgment may not rely on the allegations of its pleadings but must respond to the motion by setting forth specific facts that raise a genuine issue of fact. *Burst v. Adolph Coors Co.*, 650 F.2d 930, 932 (8th Cir.1981); *Willmar Poultry Co. v. Morton-Norwich Products, Inc.*, 520 F.2d 289, 293–94 (8th Cir.1975), *cert. denied*, 424 U.S. 915, 96 S.Ct. 1116, 47 L.Ed.2d 320 (1976). Assam's initial response did not meet that requirement, and we find its later reliance on ambiguous and unfounded deposition statements insufficient to raise a genuine issue of fact.[20] A party opposing a motion for summary judgment "must do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita*, 106 S.Ct. at 1356.

## V

The market power approach is a proper method of evaluating vertical nonprice restraints under the rule of reason and is an appropriate basis for summary judgment in such a case. If Miller lacks market power, the territorial restraints it imposed on Brewster in the distributor agreement cannot have an anticompetitive effect on interbrand competition.[21] We agree with the district court that Assam has raised no genuine issue of material fact to deter the conclusion that Miller lacks market power. Accordingly, we affirm the summary judgment.

---

A: Well, depending on, number one, what we can—let's say over the last four or five years, five, six years Millers has been our favorite because it's the biggest selling brand in the country. Windsor has been our favorite promotional item for liquor because it's the biggest. It's sixty thousand cases versus ten thousand for the second best. So we'd rather kick Miller than anything else. Obviously it's the best brand to promote. I forgot what you asked me.

Q: Is it the case now in—

A: Same thing now. Let's say Schmidt comes along and they have a dollar, two dollars a case off and you can buy a case for four and a half. We might sell that case for $4.99. That's a hell of a price for a case of good beer. We'll put something in like that. If we go back to what our druthers are, just even-steven, we'll take Millers first because it's the biggest brands.

Q: You say Miller is the biggest brand in the country today?

A: Yes. Right now they've lost some ground in the last year or so. Budweiser has kind of caught up. I guess it's 50–50 today, I would say.

Q: Competition between those two brands is pretty fierce, though?

A: It always has been.

Deposition of Fred Assam at 134–35.

**20.** Assam also argues that product differentiation in the beer industry creates an issue of fact here. Although it is true that market power may stem from product differentiation, *Graphic Products Distributors*, 717 F.2d at 1570, Assam's only support for its argument is in some excerpts from 1982 congressional hearing testimony on the Malt Beverage Interbrand Competition Act. The general testimony cited by Assam does not address the South Dakota beer market or the market power approach. Miller has presented expert affidavits asserting that product differentiation is not a significant force in the brewing industry and that brewing is a highly competitive industry. We do not believe that Assam has raised a genuine issue of fact as to product differentiation.

**21.** Assam's claim that it now has to pay a higher price for Miller beer is irrelevant to our considerations here. It may well be that because of advantageous pricing policies at Brewster Assam got a good deal on Miller beer there, but loss of that good deal does not establish an antitrust violation without proof of Miller's market power and a showing that the anticompetitive effects of the distributor agreement outweigh its procompetitive effects. Because we agree with the district court that Miller had no market power, we find no need to go further and balance the competitive effects of the agreement. We note that Brewster is not before this court complaining that it has been restrained. Assam, of course, is not precluded from buying Miller beer from its local distributor and from seeking prices from that distributor similar to those it paid to Brewster, to the extent that such activity is consistent with state regulations.