H.J., INC., a Minnesota corporation, d/b/a Anderson Dairy Supply, Appellee and Cross–Appellant,

v.

INTERNATIONAL TELEPHONE & TELEGRAPH CORP., and Flygt Corporation, a Subsidiary of ITT, Appellants and Cross–Appellees.

Nos. 86–5347 MN, 86–5348 MN.

United States Court of Appeals, Eighth Circuit.

Submitted June 9, 1987.

Decided Feb. 9, 1989.

Grant S. Lewis, New York City, for appellants and cross-appellees.

John A. Cochrane, and John E. Thomas, St. Paul, Minn., for appellee and cross-appellant.

Before Mc MILLIAN and JOHN R. GIBSON, Circuit Judges, and FAIRCHILD,[*] Senior Circuit Judge.

FAIRCHILD, Senior Circuit Judge.

This is an appeal and cross-appeal from a judgment against appellants International Telephone & Telegraph (ITT), and Flygt Corporation (Flygt), a wholly-owned subsidiary of ITT, in favor of H.J., Inc. (H.J.). H.J. alleged violations by Flygt and ITT of Sections 1 and 2 of the Sherman Antitrust Act, 15 U.S.C. § 1 *et seq.*, and state common law claims of conversion and misap-propriation, interference with customers and business, breach of contract, fraud and misrepresentation, and an "alternate count" alleging a violation of Connecticut franchise law. The case was submitted to the jury on a detailed special verdict. The jury answered in favor of H.J. The Honorable Diana E. Murphy entered judgment in favor of H.J. for $1,841,000, reflecting the trebling of one of the larger of two antitrust damage findings. Flygt and ITT appeal, arguing that it was error to deny their motions for directed verdict and judgment *n.o.v.* H.J. cross-appeals, arguing that the judgment should have reflected additional damage awards, and that its application for attorney's fees and costs should not have been denied as untimely.

Because of the posture of the case, we must consider the sufficiency of the evidence to support the verdict as to the antitrust claims, the state law claims, and the award of damages under any claim for which evidentiary support is found.

## I. FACTS

H.J. was a distributor of agricultural equipment and machinery, including manure pumps, in North and South Dakota, Minnesota and northwestern Wisconsin.

Flygt, a Connecticut corporation headquartered in Sweden, manufactures and sells world-wide a variety of pumps (including manure pumps) and other equipment for use in industry, construction, mining, municipal sewage disposal, and agriculture. ITT owns Flygt.

Originally, dairy farmers moved manure from barns to compost heaps or fields entirely by hand, employing pitchforks and wagons. During this century, the chore has become increasingly mechanized, as farmers adopted crude systems of conveyors, and, then, since the 1970's, various types of gasoline or electrically powered pumps.

When moved by a pump, manure is handled either in its "as produced" (solid) state, or as a liquid after being mixed with

* The Honorable Thomas E. Fairchild, Senior United States Circuit Judge for the United States Court of Appeals for the Seventh Circuit sitting by designation.

water. Solid manure is pumped by solid or hollow piston pumps from the barn into a pile on a cement slab, where it "cures" until ready to be spread onto fields as fertilizer. Or, if the farmer has chosen a liquid manure handling system, as the manure leaves the barn it gets mixed with water and pumped into a storage tank. The manure is then kept in a liquid state until ready to be pumped out and spread on the fields as fertilizer.

Solid piston pumps, used to move solid, "as produced," manure, do not work effectively on liquid manure. Two types of pumps have been developed to pump liquid manure: long-shaft and submersible. Long-shaft manure pumps have their motors above the surface of the manure, and use a rotating shaft to power the submerged pumping mechanism. Both the motor and pump mechanism, in contrast, of the submersible pumps go into the tank of manure. Liquid manure pumps, in addition to pumping manure in and out of storage tanks, are used as mixers to keep the stored manure liquified. Flygt manufactures submersibles.

In July, 1978, Mr. James Larsen, through the newly-formed corporation H.J., Inc., purchased the business of Anderson Dairy Supply. Anderson Dairy Supply had been a distributor of farm machinery, including manure pumps, buying from the manufacturers and selling to dealers.

In 1978, H.J. began to carry a line of submersible manure pumps made by Flygt. Flygt had first entered the manure pump market in 1977 when it adapted a municipal sewer pump to agricultural use by adding a "cutter" to the pump to prevent it from clogging with bedding straw. Flygt had approached another distributor in the area, A.O. Smith, to carry its products, but was rejected. A.O. Smith was carrying its own, long-shaft, liquid manure pump. H.J. agreed to distribute Flygt products in North and South Dakota, Minnesota, and part of Wisconsin.

At the time H.J. began distributing Flygt submersible pumps, it was also handling long-shaft manure pumps manufactured by Hedlund, a line of business left over from Anderson Dairy. Long-shaft manure pumps have certain limitations which make them less attractive than submersibles. Specifically, the shaft which powers the submersed pumping unit is subject to vibrations which cause the pump motor to wear out relatively quickly. Indeed, many of H.J.'s sales of Flygt submersible pumps did not involve conversions from solid to liquid manure handling systems, but were replacements of Hedlund long-shaft pumps.

Flygt pumps, at first, met resistance because it was a new type of pump. It also required a period of time to develop an effective pump operating on the more widely available single phase power, and to correct other difficulties.

Along with its submersible pumps and mixers, Flygt offered a necessary accessory called a "mix hoist system," or simply "hoist." The hoist, compared to the pump, is a relatively simple device used to raise and lower the pump in the manure storage tanks. The initial model of the Flygt hoist was expensive and failed to work properly. Because of concern over the cost and ineffectiveness of the Flygt hoist, H.J. contracted with a local fabricator to have its own hoist built, which it then sold to dealers at a price significantly lower than the price of the Flygt hoist. Also, there was some indication at trial that other fabricators in the region were making hoists. From the time H.J. began selling its own hoist until the termination of its distributorship at the end of 1981, no Flygt hoists were sold in H.J.'s distribution area. By November 1980, Flygt had improved the design of its own version, but the price remained high.

Until 1981, Flygt and H.J. were doing business without a written agreement. On February 18, 1981, Mr. Larsen, president of H.J., and Dennis Weber, Flygt's regional manager, signed a written distributorship agreement prepared by Flygt. It provided that the agreement could be terminated by either party on thirty days' notice. As will be seen, H.J. contended, and the district court agreed, that this agreement was invalid because one of its provisions required the signature of an officer of Flygt.

On June 25, 1981, a meeting was held for distributors, including H.J., at the Flygt offices in Norwalk, Connecticut. There, Flygt gave assurances that it remained committed to the three-tiered system of marketing through distributors. In late October, 1981, at a breakfast meeting in Copenhagen, Denmark during a week-long promotional trip to Europe for Harvestore dealers and distributors, a Harvestore dealer complained at length about the problems caused by distributorships, and suggested to Bengt Bjernfalk, Flygt's president, that Flygt eliminate its distributors and sell directly to dealers. Mr. Bjernfalk listened intently and made no commitments. (Mr. Bjernfalk denied that he considered the possibility of selling direct to dealers at that time.) In early November, Mr. Bjernfalk visited a number of Harvestore dealers in Wisconsin and Illinois. Thereafter, in late November, he discussed the idea of selling directly to dealers with Karl Ericson, who was responsible for Flygt's marketing efforts. Subsequently, Ross Chambers, the manager of Flygt's agricultural group, was instructed to develop a plan for direct sales to dealers. The plan developed by Mr. Chambers was soon adopted by Flygt.

On December 21, 1981, two Flygt sales executives visited the H.J. office and told Mr. Larsen that the distributorship was terminated effective the end of January, 1982. The oral notice of termination was confirmed by a letter from Mr. Weber, Flygt's Midwest Regional Manager, dated December 29, 1981.

Meanwhile, H.J. had expanded the percentage of its business composed of Flygt products. On November 9, 1981, it signed a lease for a new warehouse and office, at least partly in order to better handle its Flygt line. At the time the distributorship was terminated, sales of Flygt products constituted approximately 90% of H.J.'s business. In expanding, H.J. relied on Flygt's previous assurance of continued distributorships.

After the termination, H.J. attempted to find another line of manure pumps to replace the lost Flygt sales. However, Flygt remained the only pump manufacturer then marketing submersible pumps in the local agricultural market. H.J. continued to deal in a Ralco Hollow Piston pump marketed for use with "as produced" manure, and it worked to entice another submersible pump manufacturer, ABS, to enter the agricultural market. A straw cutter was developed in an attempt to adapt ABS's municipal sewer pumps to agricultural use, and about a dozen modified ABS pumps were sold. The performance of the modified ABS pumps was disappointing, though, and by October of 1982, AJM (the successor company to H.J.) discontinued its efforts to sell ABS pumps.

After January 31, 1982, although it was no longer selling Flygt pumps, H.J. did continue to market its mix hoist system for Flygt pumps. In February, 1982, Flygt reduced the list price of its own hoist from $980 to $468, ($304.20 after discount to dealers). Flygt also began picking up the tab for shipping, a cost which H.J. had paid when it was distributing Flygt hoists. H.J.'s president testified that on at least one occasion, Flygt provided hoists with pumps to a dealer at no extra charge. H.J., which had been selling its mix hoist system for $475, did not reduce its price.

In announcing the February, 1982 price cut for mix hoists, Flygt's regional manager for the Midwest, Dennis Weber, sent a letter to Wisconsin, Illinois and Minnesota Harvestore dealers. The letter claimed that Flygt was "now competitive with other mix hoist fabricators. As you know, the mix hoist is an accessory to the pump. We have lowered the price to make our package more attractive and expect Flygt mix hoist units to be ordered and installed in combination with the pump."

H.J. went out of business in August, 1982. Effective April 15, 1983, Flygt raised the list price of its mix hoist system to $638 ($414.75 after dealer's discount).

## II. SECTION 2 MONOPOLIZATION AND ATTEMPTED MONOPOLIZATION

Section 2 of the Sherman Antitrust Act makes it illegal for any person to

monopolize, or attempt to monopolize, or combine or conspire with any other person or persons, to monopolize any part of the trade or commerce among the several States, or with foreign nations.…

15 U.S.C. § 2.

### A. Monopolization

The Supreme Court has articulated a two-part test for determining if a defendant has monopolized in violation of Section 2. The plaintiff must first show that the defendant possessed monopoly power in a relevant market and then must demonstrate "willful acquisition or maintenance of that power as distinguished from growth or development as a consequence of a superior product, business acumen, or historic accident". *United States v. Grinnell Corp.*, 384 U.S. 563, 570–571, 86 S.Ct. 1698, 1703–1704, 16 L.Ed.2d 778 (1966). *Paschall v. Kansas City Star Co.*, 727 F.2d 692, 695–96 (8th Cir.1984) (*en banc*).

■ The plaintiff carries the burden of describing a well-defined relevant market, both geographically and by product, which the defendants monopolized. *Assam Drug Co., Inc. v. Miller Brewing Co., Inc.*, 798 F.2d 311, 318 (8th Cir.1986). The determination is essentially one of fact, turning on the unique market situation of each case. *U.S. v. du Pont & Co.*, 351 U.S. 377, 394–95, 76 S.Ct. 994, 1006–07, 100 L.Ed. 1264, *General Industries Corp. v. Hartz Mountain Corp.*, 810 F.2d 795, 805 (8th Cir. 1987).

The jury found that the relevant geographic market consisted of Minnesota, North and South Dakota, and northwestern Wisconsin—the extent of H.J.'s distributorship at its termination. On appeal, Flygt and ITT do not contest this finding.

In its answers to question 1 of the special verdict, the jury found that Flygt and ITT possessed monopoly power in a relevant product market or product submarket

consisting of "Submersible liquid manure pumps and mix hoist systems." The jury went on to find that the defendants maintained that monopoly power by predatory pricing (question 3) and by tying (question 4). We interpret the answer to question 1 as a finding of monopoly power in two markets or submarkets, *i.e.*, submersible liquid manure pumps, and separately, mix hoist systems.[1]

■ We readily conclude that the finding of monopoly power in the hoist market was not supported by evidence (Flygt had sold no hoists in the region during 1981) and is to be disregarded.

Flygt and ITT assert that the finding of a separate relevant product market or submarket of submersible liquid manure pumps is unsupported. They claim that the relevant market in which Flygt was selling pumps was actually broader and can only be described by including two other types of pumps: solid manure pumps manufactured by King and others, and long-shaft liquid manure pumps made by Hedlund and A.O. Smith. Flygt and ITT are asserting, in effect, that there was no evidence from which the jury could reasonably have found that submersible liquid manure pumps constitute a market distinct from that for other types of manure pumps.

For antitrust purposes, a market can be described as "any grouping of sales whose sellers, if unified by a hypothetical cartel or merger, could raise prices significantly above the competitive level." Philip E. Areeda and Herbert Hovenkamp, Antitrust Law, ¶ 518.1 at 311 (1987 Supp.). The definition of relevant market depends upon economic restraints which prevent sellers from raising prices above competitive levels. The major restraint is the availability of substitutes for the sellers' products.

Recognizing this principle, the Supreme Court has defined a "reasonable inter-

---

1. Flygt argues that the jury found the existence of a single relevant product market of liquid manure pumps *and* hoists and that the finding is unsupported. In the context of the evidence and the contentions of the parties at trial, the reading we adopt seems appropriate. *See Gallick v. Baltimore & Ohio R. Co.*, 372 U.S. 108,

119, 121, 83 S.Ct. 659, 666, 667, 9 L.Ed.2d 618 (1963) *quoting A. & G. Stevedores v. Ellerman Lines*, 369 U.S. 355, 364, 82 S.Ct. 780, 786, 7 L.Ed.2d 798 (1962) ("Where there is a view of the case that makes the jury's answers to special interrogatories consistent, they must be resolved that way.")

changeability" test for describing the relevant product market: "commodities reasonably interchangeable by consumers for the same purposes make up that 'part of the trade or commerce,' monopolization of which may be illegal." *du Pont & Co.*, 351 U.S. at 391, 76 S.Ct. at 1007.

Critical to the determination whether certain products move in the same market is their cross-elasticity of demand—the degree that buyers of one product switch to the other in response to price changes. *See, e.g., Superturf, Inc. v. Monsanto Co.*, 660 F.2d 1275, 1278 (8th Cir.1981). The higher the cross-elasticity of demand, the more buyers consider the two products substitutes for each other, and the more sensible it is to describe them as within the same market. *See du Pont & Co.*, 351 U.S. at 380–81, 76 S.Ct. at 999; *Morton Bldgs. of Neb., Inc. v. Morton Bldgs., Inc.*, 531 F.2d 910, 918–19 (8th Cir.1976).

### 1. Competing Pumps

█ Flygt and ITT claim that H.J. failed to prove, despite the presence of other types of manure pumps in the marketplace, that submersible liquid manure pumps constitute a distinct relevant market. In its brief, H.J. responds with the conclusory assertion that "[t]here were *no* operational pumps competitive with the ITT/Flygt pumps." After careful consideration, we agree with Flygt and ITT that H.J. failed to meet its burden of proof on this issue.

Flygt was the only manufacturer selling submersible liquid manure pumps within the geographic region until the beginning of 1982.[2] Defining a relevant market solely in terms of a manufacturer's own product guarantees that the manufacturer will have a "monopoly" in that market; however, it does not mean the manufacturer has true monopoly power. *du Pont & Co.*, 351 U.S. at 392–93, 76 S.Ct. at 1005–6; *Domed Stadium Hotel, Inc. v. Holiday Inns, Inc.*, 732 F.2d 480, 488 (5th Cir.1984). Products always face at least the possibili-

ty of competition from the products they are meant to supercede. "It makes no sense to say that an entrant with a new technology has monopoly power by defining the market as those customers whom the entrant has so far managed to persuade. All new entrants, indeed most competitors, would then be monopolists." *Neumann v. Reinforced Earth Co.*, 786 F.2d 424, 429 (D.C.Cir.) *cert. denied*, 479 U.S. 851, 107 S.Ct. 181, 93 L.Ed.2d 116 (1986).

Both the solid piston and long shaft manure pumps sold in the region perform the same basic function as submersible pumps —moving manure from the barn to a storage area. Both types are sold to the same customers, dairy farmers, and are handled by similar, or even the same, dealers and distributors. Nonetheless, H.J. insists there was sufficient evidence to pose a jury question on the scope of the relevant product market.

H.J. did not produce any expert testimony describing the relevant product market. There were no market data concerning sales of solid piston, long-shaft, and submersible pumps, nor was there any testimony describing the degree of cross-elasticity of demand between Flygt manure pumps and the other types of manure pumps. The only bases offered by H.J. for an inference of low cross-elasticity of demand are (1) testimony of the submersible pump's advantages over other types, (2) the suggestion of a trend toward purchase of submersibles, and (3) general (and not consistent) statements of Flygt personnel as to the lack of competition from the other types.

The Flygt submersible does enjoy several advantages over the long-shaft and solid manure pumps. In some applications, the shaft of a long-shaft pump may be too long or too short to fit a manure containment pit. The Flygt pump is easier to service, and its operational life is longer than the long-shaft pump. The Flygt submersible

---

2. For a short period in 1982, H.J. promoted and sold about 12 or 13 ABS municipal submersible liquid manure pumps modified for agricultural use. Problems in adaptation were not solved, and it never gained acceptance by dairy farm-

ers. Construing this evidence most favorably to H.J., Flygt can be considered the only meaningful manufacturer of submersible liquid manure pumps selling in the region during the period at issue.

pump is more efficient than both long-shaft and solid-piston pumps.

There was evidence suggesting a trend away from solid manure handling systems to liquified systems, and, within liquified systems, from long-shaft pumps to Flygt submersibles. This trend alone, however, fails to show that submersibles were not in the same market as solid and long-shaft pumps. Simply because Flygt pumps outperformed the others does not prove there were no economic restraints on Flygt's ability to control prices. Without a comparison of relative costs, bare conclusions of one product's superior quality are meaningless. *Acme Precision Products, Inc., v. American Alloys Corp.*, 484 F.2d 1237, 1242 (8th Cir.1973) (District Court finding that sales of superior aluminum alloy constituted relevant market overturned because less expensive but slightly inferior alloys were substitutable in 95% of uses). H.J. wholly failed to establish the relative costs of the different pumps.[3] Depending on the relative prices, a farmer may choose to retain or replace a less efficient long-shaft or solid piston pump rather than purchase a submersible. As there was evidence of some degree of substitutability between the types of pumps, it was incumbent upon H.J. to prove that the Flygt pump virtually made the other pumps obsolete—that decisions to buy a submersible pump were not significantly influenced by the availability of (imperfect) substitutes.

There was evidence of statements by Flygt personnel bearing on the competitiveness of other types of pumps with the Flygt submersibles. Some indicated they were not competitive, others that they were.

A November 24, 1980 agricultural marketing plan recognized that "[a]t the present time there are no submersible pump competitors in this marketplace. The existing competition is two fold—long shaft centrifugal pumps and positive displacement piston pumps." It went on to compare the relative advantages and disadvantages of the "competitors."

On May 19, 1981, in a memo to Ed Pirro concerning prices of agricultural equipment supplied by Flygt, Ross Chambers addressed the question of how close Flygt was to a competitive price. Mr. Chambers stated that "[t]he only units that, at this time, even come close to being a competitive unit are long shaft electric motor driven reception pit pumps.... Within reason competitive pricing is unimportant." Yet in the same paragraph Mr. Chambers noted the pressure from the other pumps on Flygt's pricing decision: "[W]e must keep the less efficient units pricing in mind. There is, I believe, a point at which the farmer can put up with inefficiency rather than make an exorbitant capital expenditure." He concluded that "a moderate [price] increase in October would create only the normal grumbling that accompanies any pricing change."

The minutes of the June 25, 1981 meeting of agricultural distributors under the heading "Marketing" stated "Competition. At present the equipment available is of non-submersible type. This presents little competition on a product to product basis. Success to this point has been so overwhelming that relatively little product knowledge has been required."

Finally, there were some statements concerning potential future expansion. Mr.

---

**3.** There was no deliberate effort to prove the prices of any products other than the mix hoist system. While the record contains scattered references to the approximate price of some of the pumps discussed, there was no systematic comparison of prices of the allegedly competing pumps. The question of relative cost is not merely academic; it is an essential consideration of any rational purchaser, here the dairy farmer, in making the decision to buy one product over another. For example, during the relevant period conversion from a solid to a liquid manure system would require a substantial investment in a new pump and containment facilities. Estimates ran as high as $30,000 to $80,000. Federal and state (at least in Minnesota) subsidies were available to defray the cost of conversion, but there was no evidence of these subsidies' effects, if any, on the relative costs of manure pumps. Converting from a long-shaft pump to a submersible involves no similar capital investment, but the only evidence introduced of the cost of long-shaft pumps relative to submersibles was that their prices were "roughly equal."

Larsen predicted that Flygt pumps would in time completely replace the long-shaft pump, and Flygt predicted that by the end of 1981, it would have captured approximately 50% of the available agricultural waste pump market. Predictions as to future sales tell little about either the definition of the relevant product market or present monopoly power.

The question is whether these conclusory statements constitute sufficient evidence to present a jury question of the existence of a market for submersible liquid manure pumps distinct from that for other manure pumps. We think they cannot. At best, they are rather casual statements, not made as part of a serious market analysis, alternately discounting and recognizing the competition posed by the other pumps.[4] This court has been insistent upon market data or similar hard evidence in identifying the relevant market. "In the absence of such proof courts are incapable of determining the extent of cross-elasticity of demand in the market." *Morton Bldgs.*, 531 F.2d at 919. Statements such as those above are not sufficient for the jury to infer the technical conclusion that submersible pumps were substantially immune from price competition from other types of manure pumps—that the sales of other pumps were not responsive to price changes in the submersible pumps, or in other words, that farmers would rather pay higher prices than switch.

### 2. Submarket

■ Describing the sales of submersible liquid manure pumps as a "submarket" rather than a market does not aid H.J. In merger cases, the Supreme Court has recognized the possibility of finding a submarket vulnerable to possible monopolization existing within a more broadly defined market. According to the Court,

[t]he boundaries of such a submarket may be determined by examining such practical indicia as industry or public recognition of the submarket as a separate economic entity, the product's peculiar characteristics and uses, unique production facilities, distinct customers, distinct prices, sensitivity to price changes, and specialized vendors.

*Brown Shoe Co. v. United States*, 370 U.S. 294, 325, 82 S.Ct. 1502, 1524, 8 L.Ed.2d 510 (1962) (footnote omitted). The "practical indicia" identified in *Brown Shoe* have been described as "evidentiary proxies for direct proof of substitutability." *Rothery Storage & Van Co. v. Atlas Van Lines, Inc.*, 792 F.2d 210, 218 (D.C.Cir.1986). In other words, the same proof which establishes the existence of a relevant product market also shows (or in this case, fails to show) the existence of a product submarket. *See* Areeda & Hovenkamp, Antitrust Law ¶ 518.1 at 311–15 (1987 Supp.).

The jury's findings of Flygt and ITT's monopolization of the pump market through tying and predatory pricing cannot support a Section 2 violation without adequate proof of the relevant product market. This is true with respect to both predatory pricing, *National Reporting Company v. Alderson Reporting Company, Inc.*, 763 F.2d 1020, 1024 (8th Cir.1985), and tying, *U.S. Steel Corp. v. Fortner Enterprises*, 429 U.S. 610, 611–12, 97 S.Ct. 861, 863, 51 L.Ed.2d 80 (1977); *Ryko Mfg. Co. v. Eden Services*, 823 F.2d 1215, 1231 (8th Cir.1987) ("... at the threshhold ... the plaintiff attacking a vertical nonprice restraint [must] prove the defendant's substantial market power in a relevant market," *citing Assam Drug Co.*, 798 F.2d at 316). *See Will v. Comprehensive Accounting Corp.*, 776 F.2d 665, 669–73 (7th Cir.1985).

### B. Attempted Monopolization

■ To establish that defendants engaged in an attempt to monopolize under Section 2 of the Sherman Act, H.J. needed to prove at least that defendants (1) specifically intended to control prices or destroy competition in some part of commerce; (2) engaged in predatory or anti-competitive conduct directed to accomplishing the un-

---

**4.** Mr. Larsen, H.J.'s president, was himself guilty of casual use of the word "compete," stating at trial that "[t]he pumps we had to compete with were the long shaft pumps that were manufactured by A.O. Smith and Hedlund."

lawful purpose; and (3) a dangerous probability of success. *Trace X Chemical v. Canadian Industries,* 738 F.2d 261, 265 (8th Cir.1984).

The jury found that defendants intended to monopolize a relevant market and that the product market was for mix hoist systems,[5] that defendants engaged in predatory pricing and tying to accomplish this unlawful purpose; and that there was a dangerous probability that defendants would succeed in gaining a monopoly in mix hoists.[6]

### 1. Anticompetitive or Predatory Conduct[7]

#### a. Predatory Pricing

■ The jury found that the defendants had attempted to monopolize through predatory pricing (question 6), doubtless by pricing Flygt's mix hoist system below cost, thereby undercutting H.J.

Predatory pricing has been defined as pricing whereby "the firm foregoes short-term profits in order to develop a market position such that the firm can later raise prices and recoup lost profits...." *Conoco Inc.,* 774 F.2d at 906 (8th Cir.1985) (quoting *William Inglis & Sons Baking Co. v. ITT Continental Baking Co.,* 668 F.2d

1014, 1031 (9th Cir.1981) (quoting *Janich Bros., Inc. v. American Distilling Co.,* 570 F.2d 848, 856 (9th Cir.1977))). This does not mean H. J. was required to prove that Flygt was foregoing all profits *as a firm* in order to gain control of the hoist market; if it did, many markets would be vulnerable to monopolization by diversified firms which could rely upon profits in one area to support losses in another. Instead, the issue of predatory pricing usually turns upon whether the defendant priced its product below some measure of cost. *See Conoco,* 774 F.2d at 906 n. 8, *Superturf,* 660 F.2d at 1281 n. 12 & 13, and cases cited. The jury was instructed that predatory pricing is the selling of a product below its average variable cost. *See McGahee v. Northern Propane Gas Co.,* 858 F.2d 1487, 1494 (11th Cir.1988) and *Janich Bros. Inc.,* 570 F.2d at 857–58 (average variable cost acceptable proxy for marginal cost, the floor below which prices may be considered predatory). Flygt and ITT do not challenge this instruction, but assert, first, that, even after the February 1982 price reduction, Flygt's hoist was actually priced above cost.

Flygt claims one component of the hoist, a nozzle, cost only $17.80 as shown on an April, 1981 invoice from its supplier, while H.J. claims Flygt's final cost for the part

---

**5.** The verdict question as to relevant product market left a blank space for the answer. The jury wrote "Submersible liquid manure pump and mix hoist systems." The question as to dangerous probability of success inquired whether there was a probability "that defendants would succeed in gaining a monopoly in mix hoists," called for a yes or no answer, and was answered "yes." Thus the question whether there was a dangerous probability of successful monopolization of the *pump* market (a quite different question altogether) was neither submitted nor answered, and the reference to the pump product market is surplusage.

**6.** There has been some conflict in decisions in this circuit whether a relevant product and geographic market must be identified. *Conoco Inc. v. Inman Oil Co., Inc.,* 774 F.2d 895, 904 n. 6 (8th Cir.1985). *Compare National Reporting Co.,* 763 F.2d at 1025 (8th Cir.1985) with *Trace X Chemical,* above. Since these findings support a determination of liability for attempting to monopolize the sale of mix hoists even if identification of a relevant product and geographic market is required, we need not resolve whatever conflict may exist.

**7.** While the parties engage in considerable discussion of whether Flygt's termination of H.J.'s distributorship violates the Sherman Act, careful reading of the jury verdict reveals that no finding was made that Flygt maintained, or attempted to acquire, monopoly power by the termination; Section 2 liability rests entirely upon the finding of predatory pricing and tying. We resist the invitation again to address the thorny question of antitrust liability for forward integration, *see Paschall,* 727 F.2d at 696, when the special verdict does not require us to do so. Even if the jury had so found, in light of our holding that H.J. failed to properly define the relevant product market, there would be no support for a finding that Flygt's change in distribution alone violated Section 2. Absent monopoly power, a supplier's unilateral refusal to deal, whatever the motivation, does not violate the antitrust laws. *Monsanto Co. v. Spray-Rite Service Corp.,* 465 U.S. 752, 761, 104 S.Ct. 1464, 1469, 79 L.Ed.2d 775 (1984); *United States v. Colgate & Co.,* 250 U.S. 300, 307, 39 S.Ct. 465, 468, 63 L.Ed. 992 (1919); *Pumps & Power Co. v. Southern States Industries,* 787 F.2d 1252, 1256 (8th Cir.1986).

was actually $114.42 or $114.75, after finishing, as shown on Flygt's January, 1982 cost data sheets. The parties agree the difference in the two figures controls whether the hoist was priced above or below cost. Mr. Ericson, Flygt's director of marketing and sales, admitted he did not know the true cost of the nozzle and that the nozzle may have required costly machining after it was purchased. This is supported by one of Flygt's cost data sheets, which shows an entry of $95.20 for "OUTSIDE PROC." The jury was free to accept H.J.'s explanation.

Additionally, there was evidence that Flygt's costs were even higher and its average price even lower. Beginning February, 1982, Flygt sometimes picked up the tab for shipping, contrary to its practice when dealing with H.J. Flygt also on at least one occasion gave away hoists free of charge to a dealer who made a large pump order.

■ Second, Flygt claims that even if its price of $305 was below its own cost, it was above H.J.'s cost of $230 to $240 per hoist. Thus, H.J. cannot claim an injury from Flygt's predatory pricing, as H.J. could have responded with its own price cut to prevent losing sales. We initially note that predatory pricing is defined in relation to the defendant's cost relative to its selling price, not relative to the plaintiff's cost, *Conoco*, 774 F.2d at 906 n. 8, and thus H.J.'s cost is apparently irrelevant.

An even more compelling reason to reject Flygt's argument is the flimsiness of the proof that H.J.'s cost was no more than $240: Mr. Larsen's single comment on cross-examination that in the fall of 1979, when H.J. first considered producing its own hoist, he could have had the hoists built for about $230 to $240, and offered to sell them to Flygt at that price. There is no evidence of what H.J.'s cost for the hoist was in February, 1982, more than two years later, when Flygt dropped its price to $305, nor anything to suggest H.J.'s cost had not increased.

### b. Tying

■ The jury did find tying as an instance of anti-competitive conduct. Because predatory pricing fulfills that element of attempt to monopolize, and there was evidence to sustain that finding, the finding of tying is no longer essential to liability. We do observe, however, that we have found no evidence that defendants coerced customers to buy the "tied" product (the hoist) in order to obtain the "tying" product (the pump). Coercion is an essential element of a tying claim. *Jefferson Parish Hospital Dist. No. 2 v. Hyde*, 466 U.S. 2, 12, 104 S.Ct. 1551, 1558, 80 L.Ed.2d 2, 17 (1984).

### 2. Intent to Monopolize

■ The record supports an inference that Flygt consciously intended[8] to have the hoist market for its own. During 1981, when H.J. was still a Flygt distributor, Flygt was offering its hoist for sale to distributors for $735. Within H.J.'s distribution area, it was losing all its hoist sales to H.J. The proposed agricultural marketing plan developed by Flygt prior to abandoning the distributorship system noted this as a "new and unexpected" problem, and proclaimed the "[r]ecapture of lost accessory item sales" a "major goal" of the proposed marketing change.

Five days after the termination of its distributorship became effective, H.J. made a nationwide mailing to all Flygt pump dealers, offering H.J.'s hoist for sale. The jury was free to conclude that Flygt's drastic price cut (from $735.00 to $304.20, making the hoist a losing proposition to Flygt), announced in an undated letter sometime in February, 1982, came in direct response to the threat to Flygt's hoist sales posed by H.J. Such action supports a finding of intent to monopolize. *United States v. Empire Gas Corp.*, 537 F.2d 296, 302 (8th Cir.1976); *American Tobacco Co. v. United States*, 328 U.S. 781, 806–07, 66 S.Ct. 1125, 1137–38, 90 L.Ed. 1575, 1592 (1946);

---

**8.** Flygt objects to the omission of the word "specifically" from the special verdict question whether defendants intended to monopolize.

This does not amount to reversible error, as the jury instructions made it clear that a finding of "specific intent" was required.

*Paschall,* 727 F.2d at 697. The inference is further supported by the substantial increase in the price of Flygt's hoist instituted after H.J. went out of business. *See* Philip Areeda and Donald F. Turner, 3 Antitrust Law, ¶ 711b at 151 (1978).

### 3. Dangerous Probability of Success

■ The jury found that there was a dangerous probability that the defendants would succeed in gaining a monopoly in mix hoists. Unlike that for submersible liquid manure pumps, there was no real question of the hoist market's definition. An inference of low cross-elasticity of demand between these hoists and other products naturally arises from the fact that the hoist was an essential, specifically designed accessory to the Flygt submersible pump, which could not function without it. Thus, the hypothetical single seller of mix hoist systems (*see* Areeda and Hovenkamp, above) would be in a position to exact monopoly profits.

Flygt does, however, challenge the jury's finding of a dangerous probability of monopolizing that market, claiming that Flygt's price reduction could not have "enhance[d] the firm's long-term ability to reap the benefits of monopoly power," *Trace X Chemical, Inc.,* 738 F.2d at 266, because of Flygt's "0% market share" and because "Bob's Job Shop or anyone else with a welding torch could have begun manufacturing mix hoist systems and priced them below Flygt's assumed monopoly price levels."

This is not a case where the only evidence supporting a dangerous probability of successful monopolization is the defendant's market share, such as *Empire Gas,* 537 F.2d at 305–06 and *Nifty Foods Corp. v. Great Atlantic & Pac. Tea Co.,* 614 F.2d 832, 841 (2d Cir.1980). As the Ninth Circuit has recognized,

> an attempted monopolization violation can be found with evidence of conduct alone. Where this analysis is used ... all three elements may be proved with

evidence of conduct that is either: (1) conduct forming the basis for a substantial claim of restraint of trade, or (2) conduct that is clearly threatening to competition or clearly exclusionary.

*Twin City Sportservice v. Charles O. Finley & Co.,* 676 F.2d 1291, 1309 (1982).

While Flygt had not sold hoists in the relevant geographic region since the fall of 1979, it was poised forcefully to reenter the market in February 1982: it had the product, the Harvestore dealers were handling its pumps, and all Flygt needed to do was lower its price to begin capturing sales. H.J., Flygt's only competitor in hoist sales, was in a precarious state, having lost its Flygt distributorship. Market entry costs, which must include marketing, were not necessarily insubstantial, considering the fact that Flygt was already dealing with the numerous Harvestore dealers. Flygt's assertion that almost anyone could enter the hoist market as producer and undersell Flygt's $305 price assumes that others could produce and sell a hoist for less than $305, which was not proved. We find the record sufficient to support the jury finding.

### III. CONSPIRACY IN RESTRAINT OF TRADE—SECTION 1

The jury also found that Flygt and ITT had entered into a contract, combination or conspiracy with one or more Harvestore dealers, and that the contract, combination or conspiracy was an unreasonable restraint of trade.[9] Flygt and ITT argue that Section 1 liability is unsupported by the record.

■ Under Section 1, there is no need to prove that concerted activity threatens monopolization; concerted behavior is treated more strictly than unilateral behavior because the former "is fraught with anticompetitive risk." *Copperweld Corp. v. Independence Tube Corp.,* 467 U.S. 752, 768–69, 104 S.Ct. 2731, 2740, 81 L.Ed.2d 628 (1984). Thus, the inquiry in Section 1 cases (contrary to Flygt's assertion in its

---

**9.** Since the jury was not asked to make a finding identifying the specific acts allegedly in restraint of trade, we may properly assume the jury considered the termination of H.J.'s distributorship to be one.

brief) does not focus upon the definition of the relevant market which may be subject to monopolization, but upon the threat of "anticompetitive effects" resulting from concerted activity.

H.J. advances the following facts as proof of concert between the defendants and one or more Harvestore dealers to effect an unreasonable restraint of trade: the Copenhagen breakfast meeting where a Harvestore dealer voiced complaints about distributors and the distributor system; Flygt's president's subsequent tour of Harvestore dealers in Wisconsin and Illinois; the decision to terminate all its agricultural distributors soon after the tour; and the price cut in mix hoist systems soon after the termination of the distributors.

 As a general principle, the existence of illegal conspiracies in restraint of trade is not lightly inferred, especially when the actions complained of may carry beneficial competitive results. *Monsanto Co. v. Spray–Rite Service Corp.*, 465 U.S. at 763, 104 S.Ct. at 1470 (1984). There is nothing inherently anticompetitive about elimination of a distribution level, and it often, if not usually, benefits the consumer. *See Paschall*, 727 F.2d at 700–01.

In *Monsanto*, the Supreme Court affirmed the jury's finding of a conspiracy between Monsanto and some of its distributors to fix and maintain prices. In doing so, it discussed the standards of proof a plaintiff must satisfy to establish concerted action under Section 1 of the Sherman Act. The mere fact that a manufacturer received complaints from one distributor about price-cutting by another distributor, and acted on them, is not enough to base a finding of concerted action. The Court noted that

distributors are an important source of information for manufacturers. In order to assure an efficient distribution system, manufacturers and distributors constantly must coordinate their activities to assure that their product will reach the consumer persuasively and efficiently. To bar a manufacturer from acting solely because the information upon which it acts originated as a price complaint would create an irrational dislocation of the market.

465 U.S. at 763–64, 104 S.Ct. at 1470. So it is for dealers.

The Court concluded that "something more than evidence of complaints is needed. There must be evidence that tends to exclude the possibility that the manufacturer and nonterminated distributors were acting independently." *Id.* The standard also entails more than "a showing that the distributor conformed to the suggested price. It means as well that evidence must be presented both that the distributor communicated its acquiescence or agreement, and that this was sought by the manufacturer." 465 U.S. at 764 n. 9, 104 S.Ct. at 1471 n. 9.[10]

 Keeping in mind the Supreme Court's warning that proof of a conspiracy should not be compartmentalized or fragmented, *Continental Ore Co. v. Union Carbide & Carbon Corp.*, 370 U.S. 690, 699, 82 S.Ct. 1404, 1410, 8 L.Ed.2d 777 (1962), the evidence in this case is still inadequate, under the standards of proof of antitrust conspiracy, to support a finding of concerted activity.

Under *Monsanto*, the complaints by the Harvestore dealer in Copenhagen, and the dealers' acquiescence in Flygt's new two-tier distribution system (and their acceptance of the lower price of the mix hoist system) are not sufficient to support a find-

---

10. Flygt also cites *Matsushita Elec. Industrial Co. v. Zenith Radio*, 475 U.S. 574, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986) as support for additional requirements that the plaintiff must prove that the defendant "had ... [a] rational economic motive to conspire, and ... [defendant's] conduct is [not] consistent with other, equally plausible explanations...." 475 U.S. at 596–97, 106 S.Ct. at 1361. The Court, facing a case decided on summary judgment, concluded that "if the factual context renders respondents' claim im-

plausible—if the claim is one that simply makes no economic sense—respondents must come forward with more persuasive evidence to support their claim than would otherwise be necessary." 475 U.S. at 587, 106 S.Ct. at 1356. There is no claim in this case that the supposed conspiracy makes no economic sense. *Matsushita Electric* does not apply. There is no question that the elimination of the distributor level was intended to, and did, benefit both Flygt and the dealers.

ing of concerted action. "[T]he existence of dealer complaints, even when coupled with manufacturer action in response to the information originating in the complaints, does not indicate the kind of commitment to a common scheme required by section 1 of the Sherman Act." *Pumps & Power Co.*, 787 F.2d at 1257 (reversing jury finding of conspiracy).

The only other evidence supporting the inference of a common scheme is the *timing* of the decisions to terminate the three-tier distribution system and to reduce the price of the mix-hoist system. The decisions' coming soon after the Copenhagen meeting and tour of Wisconsin and Illinois dealers is consistent with the possibility that some agreement was reached. However, there is no evidence tending to exclude the possibility of independent action, *Monsanto*, 465 U.S. at 764, 104 S.Ct. at 1471. Taking all the circumstances into consideration we conclude that the making of an agreement in unreasonable restraint of trade could not reasonably be inferred.

All the remaining evidence supports an inference of independent action. Mr. Ericson testified that when Mr. Bjernfalk was presented with the suggestion that Flygt sell directly to dealers, he was non-committal. Mr. Ericson claimed that he made the decision to terminate the distributors unilaterally. Beside the breakfast meeting and the tour, there is no evidence of communications between Flygt and dealers concerning the decision—no Harvestore dealers testified. A jury cannot reasonably infer the existence of a conspiracy merely from the opportunity to form one.

## IV. COMMON LAW CLAIMS

In addition to the antitrust issues, the jury was asked to answer issues on four state common law theories: breach of implied contract, tortious interference with prospective business advantage, conversion, and fraud. Because of our disposition of the antitrust cause of action, we must consider whether the jury awards (aggregating a larger recovery) under these common law theories can be sustained by the evidence introduced at trial.

### A. Contract Claims

Flygt claims that the contract between itself and H.J. was the February 18, 1981 agreement, and that Flygt effectively terminated it by giving 30 days' notice. H.J. claims the agreement was void. The district court agreed, and submitted a series of questions under the heading "Contract Claims." The jury found that Flygt and H.J. had a course of dealing which amounted to a contractual relationship with a duration of eight years (1978–1986). It awarded H.J. $110,818.31 for "unrecouped Flygt-related expenses," found that Flygt and ITT breached their obligation to deal with H.J. in good faith, and awarded $622,965.00 in damages for that breach.

The district court had held at the close of evidence that the February, 1981 agreement was not binding because it contained a clause stating that "[t]his agreement shall not be binding on Flygt until signed by an officer of the Flygt Corporation." No officer of Flygt had signed. Flygt argues that this ruling was in error because the clause was meant to protect Flygt, not H.J., and as Flygt could not have invoked the clause to its advantage due to the parties' course of dealing under it, H.J. cannot find protection in it.

▮▮▮▮ The clause in question, by its own terms, was intended to benefit Flygt: it stated that *Flygt* would not be bound to perform until one of its officers signed. The clause imposed no similar limitation on when *H.J.* would be bound. The rights created by a clause may be waived by the party for whose benefit it is intended. *Lanna v. Greene*, 175 Conn. 453, 399 A.2d 837, 841 (1978); *Miracle Construction Co. v. Miller*, 251 Minn. 320, 87 N.W.2d 665, 670 (1958); Arthur Linton Corbin, 3A Corbin on Contracts, § 761 at 516–17 (1960).[11]

11. The district court did not decide whether the law of Connecticut (where the contract was signed) or Minnesota (where H.J. was located) controlled the breach of contract claims. The parties do not claim a conflict exists between the two states' laws, and we apply generally accepted principles of contract law.

Flygt waived the requirement by acting under the terms of the contact as if it was in effect, and would have been estopped from raising the clause as a defense in an action against it on the contract. *See Schwarzschild v. Martin,* 191 Conn. 316, 464 A.2d 774, 777 (1983). H.J. also dealt with Flygt under the contract for ten months without objection. *See Cohen v. Holloways', Inc.,* 158 Conn. 395, 260 A.2d 573, 580 (1969). Both parties having treated the agreement as effective, H.J. could not claim the contract lacked mutuality.

On appeal, H.J. does not counter Flygt's arguments concerning the agreement's validity, but instead claims that even if it were binding, H.J.'s recovery would simply be enhanced: Flygt would be in violation of the Connecticut franchise law (Flygt being a Connecticut corporation), providing H.J. the right to recover for unlawful breach of a franchise agreement with a term of six years, beginning in February, 1981.

First, it is doubtful that the Connecticut franchise law applies extraterritorially. H.J. cites no authority showing that the Act was intended to protect franchises outside the state of Connecticut, and at least one court has refused so to apply it. *Carlos v. Philips Business Systems, Inc.,* 556 F.Supp. 769, 777 (E.D.N.Y.) *aff'd without opinion,* 742 F.2d 1432 (2d Cir.1983). In 1985, the Connecticut legislature amended the Connecticut Franchise Act explicitly to restrict the statute's scope to agreements "the performance of which contemplates or requires the franchisee to establish or maintain a place of business in this state." Conn.Gen.Stat. § 42–133h (1987). The amendment may well have been a clarification rather than a substantive change; extraterritorial application of a state franchise law is unusual.

■ Second, even if the Connecticut Act does apply, H.J. has failed to preserve the issue for appeal, preferring at trial to take its chances on the theory that the contract was invalid due to execution by non-officers. Having failed to seek a verdict on the alternative theory that Flygt violated the Connecticut franchise statute, H.J. cannot now request an appellate court

determination that Flygt violated the statute, and that statutory damages would be at least equal to damages found by the jury for breach of implied contract.

■ The jury found that prior to the time of termination defendants breached their obligation to deal in good faith, and the jury awarded damages. We are at a loss to know the theory underlying this issue, why this question was asked in the group entitled "Contract Claims," or why the jury was directed to answer this question even if it had answered earlier that plaintiff and defendants did not have a course of dealing which amounted to a contractual agreement. On appeal Flygt argues that this finding is unsupported and would not provide a separate basis for a damage award. H.J.'s brief is unenlightening. Its short reference to the breach of good faith finding is not found within the "Contract Claim" section, but is included within a discussion headed "Breach of Good Faith and Fair Dealing/Tortious Interference." We conclude that no recovery can be based on this finding.

### B. Fraud

The jury also found that Flygt and ITT had defrauded H.J., and accordingly, that H.J. was entitled to damages for "lost profits (project. value)" of $671,938.00. Flygt and ITT claim that there was no evidence of misrepresentations by Flygt, and even if there was, the lost profits measure of damages used by the jury is inappropriate for a fraud claim.

■ H.J. claims that Flygt misrepresented its intention to continue marketing through a distributorship system. Minnesota law follows the general common law rule that in order to support a fraud claim, a misrepresentation must be of a present fact, not a future event:

It is a well-settled rule that a representation or expectation as to future acts is not a sufficient basis to support an action for fraud merely because the represented act or event did not take place. It is true that a misrepresentation of a present intention could amount to a

fraud. However, it must be made affirmatively to appear that the promisor had no intention to perform at the time the promise was made.

*Vandeputte v. Soderholm,* 298 Minn. 505, 508, 216 N.W.2d 144, 147 (1974). Simply put, breaking a promise or failing to fulfill it does not constitute fraud. *Hayes v. Northwood Panelboard Co.,* 415 N.W.2d 687, 690 (Minn.App.1987). Therefore, H.J. had the responsibility to prove that when Flygt made the assurance that it would continue to use distributors, it held a present intention not to do so. The crucial question is, then, when did Flygt decide to eliminate the distributors?

Considering the evidence in the light most favorable to H.J., the earliest time which the jury could reasonably infer the decision to terminate the distributors was made is during the Stockholm breakfast meeting in late October, 1981, when the idea was suggested to Flygt's president. All the other evidence points to a later date: Mr. Bjernfalk denied that he considered the possibility at the time, and Mr. Chambers agreed that Mr. Bjernfalk seemed noncommittal. In early November, Mr. Bjernfalk visited the Midwest dealers, and Mr. Chambers was asked to quickly develop a marketing proposal which eliminated the distributors. The plan was approved on November 21 or 23.

As evidence of a misrepresentation, H.J. relies mainly on a distributors' meeting held on June 25, 1981, where Flygt restated its commitment to the distributorship system "as long as the distributors effectively service the entire market." Even putting aside the conditional nature of this commitment, it was made at least four months before Flygt decided to drop its distributors, and thus cannot support the fraud claim.

■ H.J. also claims that Flygt encouraged it to enter into a lease on November 9, 1981, at approximately the time Flygt was deciding to terminate its distributors. To support this claim, H.J. cites testimony by Mr. Larsen which, even if read quite generously, cannot support an inference that Flygt was aware of H.J.'s planned move and encouraged it.

■ Finally, H.J. refers to a meeting for distributors scheduled by Flygt for the first week of December, 1981. H.J. does not indicate where this planned meeting is referred to in the record, but even if there were such evidence, the mere calling of a distributors' meeting cannot reasonably be deemed a representation that Flygt remained committed to the distributors. The meeting may well have been called to discuss termination of the distributors.

*C. Conversion*

■ H.J. claims that through its own efforts, it built up a "network of Harvestore dealers," which was then converted by Flygt to its own use. The jury found that H.J. had a property interest in the Harvestore dealer network and that Flygt and ITT wrongfully converted the network, and awarded $611,000.00 in damages ("LESS 20% OPER. EXPENSES & LESS 20% NET PROFITS"). Flygt argues that the issue should never have gone to the jury because as a matter of law H.J. did not have a property interest in the Harvestore dealer network subject to conversion. We agree.

Under Minnesota law, the tort of conversion is limited to willful interference with the personal property of another. *Larson v. Archer–Daniels–Midland Co., Inc.,* 226 Minn. 315, 317, 32 N.W.2d 649, 650 (1948); *Dain Bosworth, Inc. v. Goetze,* 374 N.W.2d 467, 471 (Minn.App.1985). We have found no Minnesota cases which define the bounds of "personal property" subject to conversion, but the general rule is that the cause of action only applies to tangible property, or intangible property customarily merged in, or identified with, some document. Prosser and Keeton on Torts, 91–92 (1984); Restatement (Second) of Torts §§ 222A, 242 (1965).

H.J.'s claimed "property interest" in the network of Harvestore dealers,[12] was not

---

12. The Harvestore dealers were licensees of A.O. Smith Corporation, and in addition to being customers of H.J. and Flygt, were also competitors since they sold other manure pumps and

evidenced by any document; although H.J. prepared an exclusive dealership agreement modeled on Flygt's distributorship agreement, it was never used. We are not persuaded that the Minnesota courts would, if faced with the issue, decide to expand the tort to protect an intangible interest in a business relationship with a group of dealers. *See* Prosser, p. 92.

### D. Tortious Interference

■ The jury found that Flygt interfered with H.J.'s existing or prospective business advantage, without justification. H.J. argued at trial that Flygt's selling its mix hoist systems below cost constituted that improper interference.

In *United Wild Rice, Inc. v. Nelson*, 313 N.W.2d 628, 632–33 (1982), the Minnesota Supreme Court adopted the Restatement of Torts' definition of the tort of intentional interference with prospective contractual relations:

> One who intentionally and improperly interferes with another's prospective contractual relation (except a contract to marry) is subject to liability to the other for the pecuniary harm resulting from loss of the benefits of the relation, whether the interference consists of
>
> (a) inducing or otherwise causing a third person not to enter into or continue the prospective relation or
>
> (b) preventing the other from acquiring or continuing the prospective relation.

There is no question that Flygt's lower price induced customers of H.J. to buy hoists from Flygt, or that Flygt was aware that H.J. had been selling hoists to Harvestore dealers. Flygt merely claims that none of its actions were wrongful. Thus, the only question on appeal is whether Flygt's attempted monopolization of the hoist market was "improper" interference. We recognize that when interference comes

from a competitor, the scope of interference considered "improper" is narrowed:

> One who intentionally causes a third person not to enter into a prospective contractual relation with another who is his competitor or not to continue an existing contract terminable at will does not interfere improperly with the other's relation if
>
> (a) the relation concerns a matter involved in the competition between the actor and the other and
>
> (b) the actor does not employ wrongful means and
>
> (c) his action does not create or continue an unlawful restraint of trade and
>
> (d) his purpose is at least in part to advance his interest in competing with the other.

*United Wild Rice*, 313 N.W.2d at 633 (quoting Restatement (Second) of Torts § 768 (1979)). Flygt's attempted monopolization not only constituted "wrongful means" which deny it this "special privilege for competitors," but also was improper as required for tortious interference. Restatement of Torts (Second) § 768 comment f ("The actor's interference is improper under the rule stated in this Section if his conduct is intended illegally to restrain competition."); *United Wild Rice*, 313 N.W.2d at 633; *Conoco*, 774 F.2d at 907 ("'wrongful means' refers to … conduct which is itself capable of forming the basis for liability of the actor").

Accordingly, Flygt's liability for tortious interference is sustained.

### V. ITT'S LIABILITY

ITT argues that there is no evidence to support imposing liability on it. H.J.'s theory at trial and on appeal is that ITT is liable "as an actor,"[13] that "from beginning to end ITT was part of the warp and woof of the dealings between the parties."

---

associated services. H.J.'s conversion claim really amounts to the assertion that Flygt "stole" its good relations with the Harvestore dealers, which can be considered nothing more than a way of restating its tortious interference claim.

**13.** H.J. does not argue, in light of *Copperweld Corp. v. Independence Tube Corp.*, 467 U.S. 752, 104 S.Ct. 2731, 81 L.Ed.2d 628 (1984), that ITT formed an antitrust conspiracy with its subsidiary Flygt.

The following is the sum of all the evidence concerning ITT:

1. Flygt Corporation is a wholly-owned subsidiary of ITT. We gather the financial statements are consolidated. The secretary of Flygt was an ITT attorney. Flygt's president, Mr. Bjernfalk, reports to an ITT vice-president who heads ITT's Fluid Products group. Mr. Bjernfalk once attended a two-week business seminar held by ITT.

2. When seeking financing to purchase Anderson Dairy, Mr. Larsen showed an ITT annual report (provided to him by Flygt salesmen) to a bank, which then lent money to H.J. The bank president, aware that Flygt was an ITT company, attached importance to that backing.

3. ITT attorneys reviewed or wrote Flygt's standard written distributor agreement. Mr. Bjernfalk submitted prepared distributor agreements to ITT lawyers for comments, revisions and suggestions. The lawyers approved the signed agreements and returned them to Mr. Bjernfalk.

4. The ITT logo was apparently sometimes used in conjunction with that of Flygt.

5. At trial, Mr. Bjernfalk agreed that as Flygt "got more and more into the ITT system, more and more things that [Flygt] used to do outside were done in New York by ITT."

▮ The evidence is insufficient to raise a jury question on the issue of ITT's liability "as an actor." There was no proof that ITT was involved in the decisions upon which liability is based—the below-cost, predatory pricing which immediately followed the termination of H.J.'s distributorship. ITT cannot be held liable "as an actor" without proof that *it* performed acts sufficient to create liability, or actively influenced Flygt in its violations. *Watson v. Gulf & Western Industries*, 650 F.2d 990, 993 (9th Cir.1981) (parent corporation not liable for Title VII violations of its wholly-owned subsidiary in absence of evidence of participation or influence).

▮ Nor can ITT be held liable as the sole shareholder of Flygt, since H.J. offered no evidence to show that Flygt was a mere instrumentality or alter ego of ITT, or that Flygt is a sham corporation formed to shield ITT from liability. *See Contractors, Laborers, Teamsters & Engin. v. Hroch*, 757 F.2d 184, 190 (8th Cir.1985); *Victoria Elevator Co. v. Meriden Grain Co.*, 283 N.W.2d 509, 512–13 (Minn.1979). H.J. has not shown "the substantial reasons" necessary to disregard the presumption that a subsidiary is a legally separate entity from its parent, *Hroch.* 757 F.2d at 190; *Busch v. Mann*, 397 N.W.2d 391, 395 (Minn.App.1986).

▮ Finally, we consider whether an alternate theory of ITT's liability was available to H.J.—that of principal and agent. *See Erickson v. Minnesota & Ont. Power Co.*, 134 Minn. 209, 158 N.W. 979 (1916) (corporation liable for torts of another corporation acting as its agent). The theory was not argued, nor was the jury asked to make a finding on the issue of control. The verdict questions inquired only as to the conduct of "defendants." If the submission of the verdict in that form implied a finding by the court that ITT was Flygt's principal, we believe it was in error. There can be no judgment against ITT.

## VI. DAMAGES

### A. Compensatory Damages

▮ Whether liability is based upon attempted monopolization or tortious interference, the proper measure of damages is the present value of profits lost as a result of Flygt's improper actions, specifically its predatory pricing. *Lehrman v. Gulf Oil Corporation*, 464 F.2d 26, 44–45 (5th Cir. 1972); *Furley Sales v. North American Automotive*, 325 N.W.2d 20, 28 (Minn. 1982); Restatement (Second) of Torts, § 774A(1)(b).

The jury found the present value (February, 1986) of lost net profits to be $671,-956.00. This figure came from H.J.'s projections of sales, including both pumps and hoists, 1982 through 1986.[14] This figure

---

14. The figure inserted in the antitrust part of the

verdict was $613,800.00, but it had not been

was incorrect as damages for tortious interference with hoist sales because it included projected pump sales. For the same reason it is incorrect as damages for attempted monopoly of the hoist market.

██ It happens, however, that the record supports the figure $105,774.00 as a reasonable approximation of the 1986 value of lost profits for hoist sales, 1982 to 1986. This was the amount which H.J.'s counsel actually requested the jury to find as damages for tortious interference. Although Flygt raised no challenge at trial to any of H.J.'s damage estimates, it now attempts to persuade us that an award of this amount would be overstated because: first, the figure assumes that H.J.'s hoist would gain acceptance nationwide; second, its assumed price of H.J.'s hoist is too high, as it fails to consider the *lawful* price competition Flygt could have engaged in, had Flygt chosen not to price below cost.

Both of Flygt's arguments are complaints that H.J.'s projection of sales does not simulate the proper hypothetical market. The projection assumes a market in which H.J. sells its hoists nationwide at a price it was charging (plus minor yearly increases for inflation) before Flygt altered the market by cutting its price. The assumption of broad market acceptance of H.J.'s hoist depends largely upon its price compared to Flygt's. Thus, Flygt claims that if it entered the hoist market at a price reflecting its true cost, instead of below cost as it did, H.J.'s profits would be less, since Flygt's lawful price competition would prevent H.J. from charging a price as high as its projections assume.

Despite a superficial appeal, it is inappropriate for Flygt now to argue that the damages caused by its unlawful act are overstated because they do not consider what lawful action Flygt might have taken. Flygt had the opportunity to challenge H.J.'s damage claims before the jury, and chose not to.

We find that H.J. provided a reasonable basis at trial for an award of $105,774.00, the present (1986) value of lost hoist profits. H.J. had a quality product in its hoist, sales were brisk and increasing, as were Flygt pump sales, and H.J. had demonstrated its intent and some ability to market the hoist nationwide. Finally, Flygt did not contest as unreasonable the period of projected profits selected by H.J.

Thus it is appropriate to adopt $105,774.00 as single damages for the attempted monopolization and as compensatory damages for the tortious interference. It is appropriate (on the antitrust theory) to direct entry of judgment in favor of H.J., against Flygt, for three times $105,774.00, plus costs and attorney's fees.

### B. Punitive Damages

We need discuss this subject only because H.J., if it chooses a retrial, may attempt a greater recovery through a punitive damage award than its antitrust claim will allow.

██ Flygt challenges the sufficiency of the evidence to support any award of punitive damages. We conclude, however, that the record sustains the jury's finding, based on clear and convincing evidence, of Flygt's willful indifference to the rights of H.J., Minn.Stat. § 549.20(1) (1980); *Potthoff v. Jefferson Lines, Inc.*, 363 N.W.2d 771, 777 (Minn.App.1985) (punitive damages may be awarded for intentional interference with contractual relations). Flygt's termination of H.J.'s distributorship was motivated in part by a desire to recapture lost hoist sales. The jury could conclude that Flygt's intentional pricing below cost in order to regain those sales, an illegal attempt to monopolize the hoist market, demonstrated a willful indifference to H.J.'s right to compete in a marketplace free from illegal interference.

The jury assessed $773,873.31 punitive damages against Flygt. It had found tor-

adjusted to 1986 value. $671,956.00 was inserted with respect to improper interference, and it

had been adjusted.

tious interference (below cost pricing in order to take over H.J.'s hoist sales), conversion (Flygt's recruitment of H.J.'s dealers), and fraud (based on Flygt's termination of the distributors after stating it intended to continue the system). Each involved different conduct. We have concluded that the conduct considered by the jury in finding conversion did not as a matter of law amount to conversion, and that the conduct they considered fraudulent did not as a matter of law amount to fraud. There is no basis at all for thinking that the whole award of punitive damages was based on the conduct involved in the tortious interference. Accordingly, the $773,873.31 award cannot stand.

Neither do we have any satisfactory basis for allocating some fraction of the award to the tortious interference conduct; we readily distinguish *Kerr v. First Commodity Corp. of Boston,* 735 F.2d 281, 288 (8th Cir.1984) (where the district court remitted part of the compensatory damages awarded by the jury for fraud because of an improper theory of damages, it was not error to permit the full award of punitive damages to stand), and *Ogilvie v. Fotomat Corp.,* 641 F.2d 581 (8th Cir.1981) (where the jury assessed punitive damages for each count as a multiple of actual damages, and where the court reducing some of the compensatory awards, decided that the punitive awards should be proportionally reduced).

We conclude, therefore, that if the state law claim of tortious interference is to be pursued as an alternative to taking judgment on the attempted monopolization claim, there must be a new trial as to the merits of that claim as well as compensatory and punitive damages. *See McDonald v. Johnson & Johnson,* 722 F.2d 1370, 1388 (8th Cir.1983), *on petition for rehearing.*

## VII. CONCLUSION

The judgment appealed from is REVERSED and the cause REMANDED with directions to enter judgment in favor of H.J., Inc. and against Flygt Corporation for three times $105,744.00 plus costs and attorney's fees [15] unless, within five days of the receipt of our mandate in the district court, H.J., Inc. shall file a written election to (1) waive its antitrust claim, and (2) to have a new trial on its state law claim for tortious interference. The parties shall bear their own costs of appeal in this court and shall each bear one-half of the costs of appeal taxable in the district court under Rule 39(e) of the Federal Rules of Appellate Procedure.

---

**15.** Because we reverse the judgment of the district court, H.J.'s cross-appeal on the question of the timeliness of its attorney fees application under Local Rule 6 of the District of Minnesota is moot. If H.J. does not elect a retrial, it will have 30 days from the entry of judgment following remand to make its application for attorney's fees and costs under 15 U.S.C. § 15(a). Such fees may include the costs and fees incurred in this appeal, *Perkins v. Standard Oil Co.,* 399 U.S. 222, 90 S.Ct. 1989, 26 L.Ed.2d 534 (1970), as well as at trial, to be determined by the district court, limited to an amount reasonable in relation to the results obtained. *See Hensley v. Eckerhart,* 461 U.S. 424, 103 S.Ct. 1933, 76 L.Ed.2d 40 (1983); *Williams v. Mensey,* 785 F.2d 631 (8th Cir.1986); *Alexander v. National Farmers Organization,* 637 F.Supp. 1487 (W.D.Mo.1986).